# IN RE STEVEN M.*
## (SC 16732)

Sullivan, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued February 14—officially released July 22, 2003

*Michael Besso,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman* and *Susan Quinn Cobb,* assistant attorneys general, for the appellant (petitioner).

*Sandra A. Trionfini,* guardian ad litem, for the appellee (respondent).

*Robert J. Meredith,* deputy assistant public defender, with whom, on the brief, was *D. Keith Foren,* for the appellee (respondent).

*Martha Stone* filed a brief for the Center for Children's Advocacy, Inc., et al. as amici curiae.

*Opinion*

SULLIVAN, C. J. This certified appeal involves the proper scope of inquiry at a hearing to transfer a juvenile in the custody of the department of children and families (department) to the custody of the department of correction pursuant to General Statutes § 17a-12 (a).[1]

_____

[1] General Statutes § 17a-12 (a) provides: "When the commissioner, or the commissioner's designee, determines that a change of program is in the best interest of any child or youth committed or transferred to the department, the commissioner or the commissioner's designee, may transfer such person to any appropriate resource or program administered by or available to the department, to any other state department or agency, or to any private agency or organization within or without the state under contract with the department; provided no child or youth voluntarily admitted to the department under section 17a-11 shall be placed or subsequently transferred to the Connecticut Juvenile Training School; and further provided no transfer shall be made to any institution, hospital or facility under the jurisdiction of the Department of Correction, except as authorized by section 18-87, unless it is so ordered by the Superior Court after a hearing. When, in the opinion of the commissioner, or the commissioner's designee, a person fourteen years of age or older is dangerous to himself or herself or others or cannot be safely held at the Connecticut Juvenile Training School, or any other facility within the state available to the Commissioner of Children and Families, the commissioner, or the commissioner's designee, may request an immediate hearing before the Superior Court on the docket for juvenile matters where such person was originally committed to determine whether such person shall be transferred to the John R. Manson Youth Institution, Cheshire, if a male, or the Connecticut Correctional Institution, Niantic, if a female. The court shall, within three days of the hearing, make such determination. If the court orders such transfer, the transfer shall be reviewed by the court every six months thereafter to determine whether it should be continued or terminated, unless the commissioner has already exercised the powers granted to the commissioner under section 17a-13 by removing such person from the John R. Manson Youth Institution, Cheshire or the Connecticut Correctional Institution, Niantic." The current version

The petitioner, the commissioner of children and families, appeals from the judgment of the Appellate Court vacating the order of the trial court granting the petitioner's motion to transfer the respondent juvenile, Steven M. (juvenile), pursuant to § 17a-12 (a). *In re Steven M.*, 68 Conn. App. 427, 434–35, 789 A.2d 1169 (2002). The following questions were certified for appeal: "Did the Appellate Court properly conclude that: (1) the appeal was not moot because it met the test of 'capable of repetition, yet evading review'; (2) under . . . § 17a-12 (a), the [trial] court must determine that the requested transfer is in the juvenile's best interest; and (3) the [trial] court was required to determine the juvenile's competency before transferring him from Long Lane School [school] to John R. Manson Youth Institution [institution]?" *In re Steven M.*, 260 Conn. 916, 917, 797 A.2d 515 (2002).

We conclude that the Appellate Court properly determined that the appeal was not moot. We further conclude that, although the Appellate Court properly determined that the trial court must *consider* the best interest of the juvenile, that court improperly concluded that in order to transfer the juvenile, the transfer must be in the juvenile's best interest. Finally, we conclude that the Appellate Court properly determined that, under the circumstances of this case, the trial court was required to hold a hearing to evaluate the juvenile's competence. We further conclude, however, that the trial court's failure to hold such a hearing in the present case was harmless. Accordingly, we affirm in part and reverse in part the judgment of the Appellate Court.

The following facts are relevant to the disposition of this appeal. The juvenile, who was born in 1983, was

of this statute incorporates Public Acts 1999, No. 99-26, § 19, which substituted the Connecticut Juvenile Training School for the Long Lane School. That act also made technical changes for purposes of gender neutrality. None of those changes is relevant to the appeal here.

committed to the custody of the department in 1991 on the basis of a finding of parental neglect. *In re Steven M.*, supra, 68 Conn. App. 429. The juvenile has been diagnosed with dysthymia, conduct disorder, mild mental retardation and borderline personality disorder.[2] Id., 433. In 1998, the juvenile was placed at Riverview Hospital, a mental health facility for children that is under the jurisdiction of the department. Id., 429 and n.3. While at Riverview Hospital, the juvenile engaged in aggressive behavior, which included assaults on both other juveniles at the hospital and hospital staff members.[3] On April 7, 1999, the juvenile was charged with, among other things, two counts of disorderly conduct on the basis of this aggressive behavior. Id., 429.

On April 14, 1999, a competency evaluation was ordered; id.; and on May 5, 1999, an evaluator from the juvenile public defender's office concluded that the juvenile was incompetent, but restorable. The juvenile remained at Riverview Hospital and, in November, 1999, Riverview Hospital reported to the Juvenile Court that the juvenile was competent.[4] On December 23, 1999, an independent evaluation from the juvenile public defender's office stated that the juvenile was compe-

[2] The record before this court also reflects that the juvenile was diagnosed with oppositional defiant explosive disorder and traumatic brain injury.

[3] According to the department, from July 15, 1998, to January 12, 2000, the juvenile "was placed in two-point restraints on 188 occasions, 5-point restraints 49 times and restricted to his unit for most of the latter part of his stay. The police were called to intervene with [the juvenile] a total of 37 times during 1999. Despite these extreme measures he assaulted and seriously injured 2 other patients, assaulted and seriously injured 3 staff, and significantly injured another 8 staff during attempts to restrain him." The department further noted that the juvenile "accumulated a series of legal charges during this time including Assault on a Peace Officer (2 counts), Assault 3 (2 counts), Threatening and Disorderly Conduct, and Criminal Mischief."

[4] During this period, while the department was attempting to restore the juvenile's competency, the juvenile continued to engage in the same type of aggressive behavior.

tent. It is unclear from the record whether the Juvenile Court ever found the juvenile competent. The parties, however, agreed on December 23, 1999, that the juvenile was competent.

On January 12, 2000, the juvenile pleaded guilty to two counts of disorderly conduct. At the plea hearing, the juvenile's attorney represented to the court that the juvenile was competent. The court adjudicated the juvenile as a delinquent and committed him to the custody of the department for eighteen months, placing him at the school, a facility under the jurisdiction of the department. While at the school, the juvenile continued to engage in aggressive behavior. In March, 2000, the juvenile was arrested and charged as an adult[5] as a result of this aggressive behavior. He subsequently was transferred to an adult correctional facility to await trial.

On March 17, 2000, representatives of the department, the department of correction, the department of mental retardation, and the department of mental health and addiction services met to review the juvenile's case and to develop a long-term plan to manage him. At that meeting, the department was made aware that the juvenile was scheduled to appear in adult criminal court on March 20, 2000, where he was likely to be found incompetent, but restorable. The department anticipated that if the juvenile was found to be incompetent, he would be released from the adult system and that the department would then resume responsibility for his custody in order to render him competent to stand trial. In anticipation of this series of events, on March 22, 2000, the petitioner filed a motion, pursuant to § 17a-12 (a), to transfer the juvenile to the institution, alleging that the juvenile was a danger to himself and to others and could not be safely maintained by the department.

---

[5] It is unclear from the record before this court what crime the juvenile was charged with committing.

On April 3, 2000, a transfer hearing was held. Id. At the outset of the hearing, the juvenile assistant public defender requested that the court appoint a guardian ad litem because he had been unable to ascertain the juvenile's position regarding the transfer; id.; stating that he had "met with [the juvenile] . . . and during the course of that conversation . . . [the juvenile] represented that he wanted to do two different things. One was [to] go to [the school]. One was to go to [the institution]." The court noted that it had been made aware of a report stating that the juvenile would be found incompetent but restorable in the adult criminal system, and it appointed a guardian ad litem.[6]

At the transfer hearing, the petitioner claimed that the juvenile was a danger to himself and to others and that the department was incapable of safely maintaining him. The juvenile did not dispute these allegations. Rather, he claimed that it was not in his best interest to be transferred to the institution and that, if the department would put "appropriate behavior modification plans and the appropriate staff" into place, the department would be able to maintain him safely. The juvenile sought to present evidence, in the form of expert testimony, that, although he did present a danger to others, if he were provided with appropriate services he could be maintained safely by the department. The court declined to take evidence on the issue of what "appropriate services" the department might put into place. The court concluded that it was obligated under the statute to balance the danger posed by the juvenile against the juvenile's best interest.[7] The court concluded that it had been clearly demonstrated that the

---

[6] On April 4, 2000, the juvenile was found incompetent but restorable in the adult criminal system.

[7] The court stated: "I can look at the criteria set in the statute, and I can also look as an overview [at the] best interest of the child. I also have the public safety concerns which have to be a balance against the best interest of the child. Which I think is a fair balancing test."

juvenile was a danger to himself and to others. Accordingly, the court granted the petitioner's motion to transfer the juvenile to the institution effective upon the juvenile's discharge from the adult criminal system.

The juvenile appealed to the Appellate Court, claiming that he was denied due process of law. Id., 428. The Appellate Court vacated the order of the trial court; id., 429, 435; concluding that the juvenile was denied due process of law because the trial court improperly had failed (1) to determine the juvenile's competency prior to ordering his transfer; id., 434; and (2) to determine whether the transfer was in the juvenile's best interest, after considering alternatives to transfer to the institution. Id., 435. This appeal followed.

I

The petitioner first claims that, because the juvenile has reached the age of eighteen and is no longer in the custody of the department, his appeal is moot and that the Appellate Court improperly concluded that it is subject to the "capable of repetition, yet evading review" exception to the mootness doctrine. We disagree.

The Appellate Court concluded, and the parties do not dispute, that the present case has become moot. Id., 430. "When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot. . . . It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . .

"We note that an otherwise moot question may qualify for review under the capable of repetition, yet evading

review exception. To do so, however, it must meet three requirements. First, the challenged action, or the effect of the challenged action, by its very nature must be of a limited duration so that there is a strong likelihood that the substantial majority of cases raising a question about its validity will become moot before appellate litigation can be concluded. Second, there must be a reasonable likelihood that the question presented in the pending case will arise again in the future, and that it will affect either the same complaining party or a reasonably identifiable group for whom that party can be said to act as surrogate. Third, the question must have some public importance. Unless all three requirements are met, the appeal must be dismissed as moot." (Citations omitted; internal quotation marks omitted.) *Conetta* v. *Stamford*, 246 Conn. 281, 295–96, 715 A.2d 756 (1998). We conclude that the present case meets all three requirements for review under the "capable of repetition, yet evading review" exception to the mootness doctrine.

Pursuant to General Statutes § 46b-141 (a),[8] a juvenile who has been convicted as a delinquent shall be committed to the custody of the department for "(1) an indeterminate time up to a maximum of eighteen months . . . ." At any time after commencement of that eighteen month time period, the department may seek to have the juvenile transferred pursuant to § 17a-12 (a). The effect of the transfer order is thus limited, by its very nature, to less than eighteen months and, therefore, is of such a limited duration that a substantial

[8] General Statutes § 46b-141 (a) provides: "Except as otherwise limited by subsection (i) of section 46b-140, commitment of children convicted as delinquent by the Superior Court to the Department of Children and Families shall be for (1) an indeterminate time up to a maximum of eighteen months, or (2) when so convicted for a serious juvenile offense, up to a maximum of four years at the discretion of the court, unless extended as hereinafter provided."

majority of the cases in which such an order is entered will evade review.

In addition, there is a reasonable likelihood that the questions presented by the present case will arise each time that the department seeks to transfer to the custody of the department of correction a juvenile convicted as a delinquent. Moreover, recurrence of the questions presented by this case will affect a reasonably identifiable group for whom the juvenile in this case can be said to act as surrogate, specifically, any juvenile convicted as a delinquent whom the department seeks to transfer to the custody of the department of correction.

Finally, we conclude that the resolution of the proper scope of inquiry at a transfer hearing when the department seeks to transfer a youth in its custody to the custody of the department of correction presents a question of public importance, specifically, a determination of the standards governing the department's statutory duty to care for the children in its custody, including children "who are mentally ill, emotionally disturbed, substance abusers, delinquent, abused, neglected or uncared for . . . ." General Statutes § 17a-3. Accordingly, we affirm the Appellate Court's conclusion that the questions presented by this appeal are "capable of repetition, yet evading review."

II

The petitioner next claims that the Appellate Court improperly concluded that, before transferring a juvenile pursuant to § 17a-12 (a), the court must determine that the transfer is in the juvenile's best interest. We conclude that § 17a-12 (a) requires that the trial court *consider* whether a transfer is in the best interests of the child. We further conclude, however, that the juvenile's best interest is not dispositive. Rather, § 17a-12 (a) also requires that the trial court determine whether the juve-

nile is a danger to himself or herself or others or cannot safely be maintained by the department. If such a danger exists, the juvenile may be transferred pursuant to that statute. We further conclude that the Appellate Court improperly determined that the trial court improperly had refused to consider evidence on the best interest of the juvenile.

We begin by setting forth the relevant standard of review. "Statutory construction is a question of law and therefore our review is plenary." (Internal quotation marks omitted.) *Grondin* v. *Curi*, 262 Conn. 637, 649, 817 A.2d 61 (2003). "We construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation. . . . Moreover, a court must construe a statute as it finds it, without reference to whether it thinks the statute would have been or could be improved by the inclusion of other provisions." (Citation omitted; internal quotation marks omitted.) Id., 652.

The circumstances under which the department may effect the transfer of any juvenile in its custody are set forth in the first sentence of § 17a-12 (a), which provides in relevant part: "When the commissioner . . . determines that a change of program *is in the best interest of any child or youth committed or transferred to the department*, the commissioner . . . may transfer such person to any appropriate resource or program administered by or available to the department, to any other state department or agency, or to any private agency or organization within or without the state under contract with the department . . . provided no transfer shall be made to any institution, hospital or facility under the jurisdiction of the Department of Correction . . . unless it is so ordered by the Superior Court after a hearing. . . ." (Emphasis added.) Accordingly, to effectuate any transfer of a juvenile in the custody of the department, the petitioner must first determine that it is

in the child's best interest to do so. When the petitioner seeks to transfer a juvenile in the custody of the department to the department of correction, however, there is an additional requirement: the Superior Court must order the transfer following a hearing.

The second sentence of § 17a-12 (a) provides that, when the petitioner seeks to transfer to the custody of the department of correction a juvenile who poses a safety concern, an immediate hearing before the Superior Court must be held. The scope of the inquiry at such hearing is also set forth in the second and third sentences of § 17a-12 (a), which provide in relevant part: "When, in the opinion of the commissioner . . . a person fourteen years of age or older is *dangerous to himself or herself or others or cannot be safely held at [Long Lane School]*, or any other facility within the state available to the Commissioner of Children and Families, the commissioner . . . may request an immediate hearing before the Superior Court on the docket for juvenile matters where such person was originally committed to determine whether such person shall be transferred to the John R. Manson Youth Institution, Cheshire, if male . . . . The court shall, within three days of the hearing, make such determination. . . ." (Emphasis added.)

Thus, the first sentence of § 17a-12 (a) provides that, as a general rule, the sole criterion for the transfer of a juvenile to another facility, including a transfer to the custody of the department of correction, is that the transfer be in the best interest of the juvenile. When the petitioner seeks to transfer an allegedly *dangerous* juvenile to the department of correction, however, the best interest of the juvenile is not the sole criterion for determining if such transfer is appropriate. In that instance, the second sentence of § 17a-12 (a) provides that the danger posed by the juvenile to himself or herself or to others must also be considered. Section

17a-12 (a) thus attempts to balance two competing interests, namely, the best interest of the individual child in the department's custody and the safety of the group of children in its custody. Accordingly, we conclude that, taken as a whole, § 17a-12 (a) requires that the trial court, in determining whether to transfer an allegedly dangerous juvenile to the custody of the department of correction, must consider both the best interest of the juvenile posing a safety concern and the danger posed by that juvenile to other juveniles with whom the subject juvenile is or will be situated.

In the present case, at the transfer hearing on April 3, 2000, the trial court was presented with uncontroverted evidence that the department was unable to maintain the juvenile in a safe manner in any of its facilities and that the juvenile posed a danger to himself and to others. The juvenile's guardian ad litem maintained that it would be in the juvenile's "worst interest" to be transferred to the institution "because of the open environment . . . ." The guardian ad litem did not contend, however, that it would be in the juvenile's best interest to remain at the school under the conditions as they existed at the time of the transfer hearing. Instead, the guardian ad litem argued that it would be in the juvenile's best interest to leave the juvenile at the school under "appropriate services . . . ." The guardian ad litem sought to present the court with evidence in the form of expert testimony that, although the juvenile did "present a danger to others," it was in the juvenile's best interest to remain at the school and be "given the appropriate services that need to be put into place that have been neglected . . . ."

The trial court would not allow the guardian ad litem to present evidence on this hypothetical scenario, stating that "[t]hat's not the issue for me today. . . . I can look at the criteria set in the statute, and I can also look as an overview [at the] best interest of the child.

I also have the public safety concerns which have to be a balance against the best interest of the child. Which I think is a fair balancing test. Clearly, the best interest of . . . here is, everyone around him—at times—one time or another due to his problems, is at risk, including himself. And with the response he would bring upon himself, I can foresee when someone really gets hurt and how they might try to defend themselves."

Thus, it is clear that the trial court did consider which *of the available alternative placements*, namely, to leave the juvenile at the school, where he was known to be a danger to himself and to the other juveniles in the custody of the department, or to transfer him to the institution, an arguably less pleasant but more secure facility, would be in the juvenile's best interest. It is also clear that the trial court balanced that interest against the danger posed by the juvenile to himself and to others. The trial court was under no obligation to consider a utopian third possibility of ordering the department to keep the juvenile at the school under "appropriate services . . . ."[9] The department sought

---

[9] The legislature has not defined "best interest" as used in § 17a-12 (a). "Historically, this court has likewise eschewed defining the phrase in different contexts as opportunities to do so have arisen"; *Ireland* v. *Ireland*, 246 Conn. 413, 429, 717 A.2d 676 (1998); and we see no need to do so in this case. We note, however, that, in a different context, the United States Supreme Court has recognized that, " '[t]he best interests of the child' is . . . not an absolute and exclusive constitutional criterion for the government's exercise of the custodial responsibilities that it undertakes, which must be reconciled with many other responsibilities. Thus, child-care institutions operated by the State in the exercise of its parens patriae authority . . . are not constitutionally required to be funded at such a level as to provide the *best* schooling or the *best* health care available . . . . And the same principle applies, we think, to the governmental responsibility at issue here, that of retaining or transferring custody over a child who has come within the . . . Government's control, when the parents or guardians of that child are nonexistent or unavailable. Minimum standards must be met, and the child's fundamental rights must not be impaired; but the decision to go beyond those requirements—to give one or another of the child's additional interests priority over other concerns that compete for public funds and administrative attention—is a policy judgment rather than a constitutional

to transfer the juvenile precisely because it did not have an appropriate program for this juvenile. Moreover, the record before this court reflects that the department was making an effort to establish an appropriate program for this juvenile and sought the transfer to ensure his safety and the safety of the other juveniles in its care until such a program could be implemented. Accordingly, we conclude that the trial court properly applied the standards set forth in § 17a-12 (a).

The Appellate Court concluded, however, that "[t]o comport with fundamental fairness [as required by the due process clause of the fourteenth amendment to the United States constitution], and in accord with the state's parens patriae interest, the [trial] court must determine whether the proposed transfer is in the best interest of the child after it finds the juvenile to be competent." *In re Steven M.*, supra, 68 Conn. App. 434–35. It also stated that, "§ 17a-12 (a) requires that a transfer from one facility to another be in the best interest of the child." Id., 434. Thus, although the Appellate Court apparently believed that the trial court was required to consider *only* the juvenile's best interest in making the transfer determination, it is not entirely clear whether the Appellate Court believed that requirement to be a constitutional limitation on the application of § 17a-12 (a), or whether it reached that conclusion as a matter of statutory interpretation. In either case, we disagree.

As we have already concluded, the statute requires that the trial court consider *both* the best interest of the juvenile *and* the safety of those under the protection of the department in determining whether to transfer a juvenile to the department of correction. We also

imperative." (Citation omitted; emphasis in original.) *Reno* v. *Flores*, 507 U.S. 292, 304–305, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993). Nothing in the relevant statutes suggests that juveniles in the custody of the department are entitled to a higher standard.

conclude that the juvenile's liberty interest in not being transferred is adequately protected by the statute's requirement for a hearing at which both of these issues must be considered. Counsel for the juvenile has cited no authority, and we have found none, for the proposition that due process prohibits the department from considering the safety of all of the juveniles under its care in determining where to house individual juveniles.

## III

It remains for us, therefore, to determine only whether the Appellate Court properly concluded that, "to comply with procedural due process, the [trial] court must first determine the competency of the juvenile before ordering a transfer" from the department to the department of correction. Id. The Appellate Court reasoned that the transfer hearing is analogous to a delinquency hearing, which, in turn, requires the same procedural protections as a criminal trial. Id., 433. Accordingly, it concluded that, because due process mandates that an adult be competent to stand trial before he can be convicted, it also mandates that a juvenile be competent before he can be transferred pursuant to § 17a-12 (a). Id. Although we disagree that the transfer proceeding implicates the same liberty interest as a delinquency proceeding, we agree that, under the circumstances of this case, fundamental fairness required that the trial court hold a competency hearing. The failure to hold such a hearing in the present case, however, was harmless.[10]

It is well settled that, in the adult context, "[t]he conviction of an accused person who is not legally competent to stand trial violates the due process of law guaranteed by the state and federal constitutions."

[10] To the extent that the Appellate Court's opinion can be construed as *always* requiring a competency inquiry before a transfer pursuant to § 17a-12 (a), it is overruled.

(Internal quotation marks omitted.) *State* v. *Garcia*, 233 Conn. 44, 67, 658 A.2d 947 (1995), on appeal after remand, 235 Conn. 671, 669 A.2d 573 (1996). The constitutional test for competency is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and whether he has a rational as well as factual understanding of the proceedings against him." (Internal quotation marks omitted.) *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960).

Unlike an adult's liberty interest, however, a juvenile's liberty interest always is limited by the state's independent parens patriae interest in preserving and promoting the juvenile's welfare, and "must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody." *Schall* v. *Martin*, 467 U.S. 253, 265, 104 S. Ct. 2403, 81 L. Ed. 2d 207 (1984). Thus, due process "does not mandate elimination of all differences in the treatment of juveniles." Id., 263. Moreover, just as a criminal conviction "sufficiently extinguished the [adult] defendant's liberty interest to empower the State to confine him in any of its prisons"; (internal quotation marks omitted) *State* v. *Davis*, 190 Conn. 327, 338, 461 A.2d 947, cert. denied, 464 U.S. 938, 104 S. Ct. 350, 78 L. Ed. 2d 315 (1983); unless the transfer to a different facility constitutes "a major change in the conditions of confinement amounting to a grievous loss"; (internal quotation marks omitted) *State* v. *Campbell*, 224 Conn. 168, 188, 617 A.2d 889 (1992), cert. denied, 508 U.S. 919, 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993); a juvenile who already has been adjudicated delinquent and is in the custody of the state does not possess the same liberty interest as a juvenile who faces delinquency proceedings. A fortiori, a delinquent juvenile who faces transfer proceedings pursuant to § 17a-12 (a) does not have the same liberty interest as an adult who faces criminal proceedings.

Accordingly, we conclude that the fact that, under the due process clause, an adult who is not competent cannot be convicted of a crime does not mean that a juvenile who is not competent cannot be transferred to the department of correction pursuant to § 17a-12 (a). If that were the case, then the department would be required to maintain an incompetent juvenile in a facility where he poses a danger to himself and others until he becomes competent. We do not believe that due process requires the department to impose such risks on the other juveniles under its care.

We also conclude, however, that fundamental fairness requires that the juvenile be adequately represented at the § 17a-12 (a) hearing so that the court may make an informed and accurate determination of the juvenile's best interest and the danger that he poses. Accordingly, we conclude that, if there is evidence that a juvenile who is subject to transfer proceedings is incompetent, the trial court must hold a competency hearing to determine whether the juvenile is capable of assisting his attorney in representing his interests at the transfer hearing. We further conclude that, if the court determines that the juvenile is not competent, then the appointment of a guardian ad litem to represent the juvenile's interests at the transfer hearing adequately protects the juvenile's due process rights. See *In re Steven G.*, 210 Conn. 435, 440–41, 556 A.2d 131 (1989) (juvenile proceedings must comport with fundamental fairness); see also *Washington* v. *Harper*, 494 U.S. 210, 228, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990) (due process requires examination of "what procedural protections are necessary to ensure that the decision [to infringe on liberty interest] is neither arbitrary nor erroneous"); *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (due process requires consideration of "the risk of erroneous deprivation of [a protected] interest through the procedures used").

In the present case, the record reflects that the trial court at the transfer hearing on April 3, 2000, was presented with evidence in the form of a letter from the department stating that the juvenile was likely to be found incompetent but restorable following a competency evaluation in the adult criminal system. Moreover, the likelihood that the juvenile was incompetent was discussed at the transfer hearing and the juvenile's attorney requested a follow-up hearing pending the results of a competency evaluation in the adult criminal system. Accordingly, we conclude that there was sufficient evidence presented to the trial court at the April 3, 2000 transfer hearing to indicate the need for a competency evaluation.

We also conclude, however, that the trial court's failure to hold a competency evaluation in the present case constitutes harmless error. As we have already concluded, if, after holding a competency hearing, the trial court determines that a juvenile whom the petitioner seeks to transfer is incompetent, all that due process requires is that the trial court appoint a guardian ad litem to represent the juvenile's best interest at the transfer hearing. In the present case, the trial court noted the juvenile's potential incompetence and, accordingly, appointed a guardian ad litem. We conclude, therefore, that the juvenile's interests were adequately represented at the hearing and that the hearing comported with the fundamental fairness requirement of the due process clause. Accordingly, we conclude that the trial court's failure to hold a competency hearing constitutes harmless error.

The judgment of the Appellate Court, insofar as it vacated the order of the trial court granting the motion to transfer, is reversed and the case is remanded with direction to affirm the order of the trial court.

In this opinion the other justices concurred.