IN RE ZION R.*
(AC 29907)

Harper, Lavine and Beach, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued May 26—officially released September 1, 2009

*Karen Oliver Damboise,* for the appellant (respondent mother).

*Stephen G. Vitelli,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Opinion*

LAVINE, J. The respondent mother appeals from the judgment of the trial court terminating her parental rights with respect to her minor child, Zion. On appeal,

the respondent[1] claims that the court improperly (1) concluded that she had failed to achieve such degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the child's life[2] and (2) considered the best interest of the child during the adjudication phase of the petition.[3] We affirm the judgment of the trial court.

The following procedural history and facts, found by the court, *Foley, J.*, are relevant for our review of the respondent's claim. The child was born on August 30, 2006, and the petitioner, the commissioner of children and families, placed a ninety-six hour hold on her behalf

[1] The court also terminated the parental rights of the child's father, who has not appealed from the judgment. We therefore refer to the mother as the respondent in this opinion. The counsel for the child filed a statement adopting the brief of the petitioner, the commissioner of children and families.

[2] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and *has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child* . . . ." (Emphasis added.)

The child was adjudicated neglected in a prior proceeding on March 19, 2007, and the court, *Boland, J.*, ordered that the specific steps to facilitate the return of the child to the respondent, entered on September 1, 2006, remain in effect.

[3] In her appellate brief, the respondent additionally claims that the court improperly interpreted General Statutes § 17a-112 (j) by placing a burden on her to show that she had a former constructive and useful parental role. The respondent bases this claim on the court's finding in its memorandum of decision that neither the respondent nor the child's father "has ever had a 'former constructive and useful' parental role." We decline to address this claim because the court's language in the memorandum does not lead us to conclude that it interpreted § 17a-112 (j) as containing a requirement that the respondent show that she had a former constructive and useful parental role. We therefore conclude that the respondent's claim is without merit.

on September 1, 2006. See General Statutes § 17a-101g. On that same day, the petitioner filed a motion for an order of temporary custody and a petition alleging that the child was neglected. The court, *Boland, J.*, issued an order of temporary custody, placing the child in the care of the petitioner on September 1, 2006. The child was adjudicated neglected on March 19, 2007. See footnote 2.

The respondent has had an extensive history with the department of children and families (department) since 1999. Four of her six children already had been removed by the department, and her parental rights have been terminated with respect to at least two of them.[4] The department had ongoing concerns regarding the respondent's inadequate living conditions, substance abuse issues, domestic violence issues, inadequate supervision of children, lack of parenting skills and unaddressed mental health issues. The respondent has a history of alcohol and substance abuse, including abuse of cocaine and metamphetamine, that started when she was twelve years old. She admitted to last using cocaine sometime in January, 2007. The respondent had suicidal tendencies at a young age. She was placed in juvenile detention after threatening to kill her mother. She escaped after assaulting a staff member with a baseball bat. The respondent is diagnosed with borderline personality disorder and possible post-traumatic stress disorder.

The respondent had a long history of engaging in relationships with men who were controlling and physically abusive toward her and her children. In 2005, the

---

[4] Although the precise legal status of all of the respondent's children was unclear at the time of the trial, the file indicates that the respondent has given birth to six children. Two of them were adopted by paternal grandparents, and neither of those children were in her custody at the time of the filing of the petition for termination of parental rights or at the time of the trial. The two children who remained living with the respondent prior to Zion's birth were removed by the order of temporary custody on May 15, 2006.

respondent left her eldest daughter in the care of the respondent's father, who allegedly sexually abused the daughter. The respondent later stated that her father also had sexually abused her when she was younger. In November, 2005, the department received a report of a domestic violence incident between the respondent and J, the father of one of her children. In May, 2006, the respondent reported that R, the child's father, had pushed her against a wall. On May 13, 2006, R was arrested after hitting his then fifteen year old son in the face with a socket wrench.[5] The respondent instructed her children not to give statements to the police in connection with that incident. On March 28, 2006, the department learned that another son of R, who also resided with the respondent and her children, reportedly abused his six year old half-sister in 2003. The respondent indicated that she was aware of that report but did not think that he was a threat to her children. On May 9, 2006, the respondent left the family home because R had physically and verbally abused her. Also in May, 2006, the department received reports that R sexually abused the respondent's eldest daughter. Between June and August, 2006, the respondent regularly visited R in prison and received letters from him, in one of which he called her a dog and wrote that he was going to walk her to a dog park.

The department had concerns regarding the respondent's housing. On December 8, 2005, she obtained housing through a housing authority but was evicted in January, 2006, after she allowed R and his two sons to reside there. During the summer of 2006, while pregnant with the child, she missed numerous prenatal doctor appointments, including stress tests. In the summer of 2006, she went through a period of homelessness and

---

[5] The child's father, who has an extensive criminal record, remains incarcerated following this incident, with a minimum release date of August 12, 2011.

briefly stayed at a domestic violence shelter. She was asked to leave the shelter in August, 2006, after receiving warnings for noncompliance with curfew and noncooperation with domestic violence counseling. During the summer and until December, 2006, the respondent rejected housing options in programs that would have allowed her to have her children with her. In about December, 2006, the respondent's whereabouts were unknown to the department, and she later said that she was temporarily living in her car. After she resumed contact with the department and informed it that she was living with a female friend, she failed to comprehend why the friend's significant criminal history made that residence inappropriate for the purposes of reunification with her children, stating that the friend "accidentally murdered someone when they were teenagers and 'gang bangers.'"

Prior to the child's birth, the department provided numerous services to the respondent, including an intensive family preservation program, from which the respondent was discharged upon the removal of her children from the home. The department also offered domestic violence counseling, which the respondent failed to complete successfully. She similarly refused individual therapy services, as well as offers to enter into a domestic violence shelter while she resided with R. In January, 2007, the respondent entered into Youth Challenge Mission for Women (Youth Challenge), a twelve to eighteen month program with a religious focus, primarily directed at substance abuse. In February and March, 2007, the department informed the respondent that Youth Challenge did not meet the needs of reunifying her with the child because of the length of the program and the fact that the child could not reside and bond with her. Tammy Bailey, a social worker for the department, sent a letter to the respondent in March, 2007, listing four programs in which she

could have children with her. The respondent stated that she wanted to remain at Youth Challenge. Bailey testified that the department was unable to evaluate the respondent's progress at Youth Challenge because her progress reports offered no indication of how the respondent would function in the general community.

On September 19, 2007, the petitioner filed a petition for termination of parental rights. A trial before Judge Foley took place on April 1 and 3, 2008. The court heard testimony from the respondent; Bailey; Melissa Bair, a social worker for the department; Stephen M. Humphrey, a licensed clinical psychologist; Barbara Wagenbrenner, a developmental therapist; and Shari Jennings, the intake supervisor at Youth Challenge. On April 8, 2008, the court granted the petition and ordered the termination of parental rights. The court found that the department had made reasonable efforts to reunify the child with the respondent, that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the child's life, and that the termination of parental rights was in the child's best interest. The respondent filed an appeal from the court's judgment on May 19, 2008. Further facts will be set forth as necessary.

I

The respondent's first claim is that the court improperly found that she had failed to achieve such degree of rehabilitation as would encourage the belief that within a reasonable time, considering the child's age and needs, she could assume a responsible position in the child's life. The respondent argues that the court disregarded evidence of her progress at Youth Challenge, especially in light of the fact that participation in the program was included in the court-ordered specific

steps. She also argues that the court improperly found that her rehabilitation was not foreseeable within a reasonable time. We disagree with the respondent.

The following additional facts are necessary for our consideration of the respondent's claim. The court heard the testimony of the respondent and Jennings regarding Youth Challenge. The respondent testified that the participants at Youth Challenge are strictly supervised during their first year at the program. Jennings stated that the participants are chaperoned twenty-four hours a day for the first twelve months of the program. The respondent described in detail her highly structured and monitored schedule at the program and contrasted it with her previous lifestyle. She testified about personal changes she had undergone. The evidence shows that, although the respondent was frustrated during the first six months at the program, she had made significant progress at the time of the trial in April, 2008. She no longer required strict supervision and had assumed certain duties within the program. The respondent also testified that she was looking for employment and pursuing a spot on the Hartford housing authority list.

The petitioner introduced testimony and a psychological evaluation report from Humphrey, who observed and interviewed the respondent and her children in May and June, 2007. In addition to diagnosing the respondent with borderline personality disorder, Humphrey determined that she has a history of cocaine and alcohol abuse, problematic attachment, sexual abuse, suicidal ideation and gestures and self-injurious behavior. She has minimal formal education and employment history, significant problems with independent living unrelated to her intellectual ability, difficulties with interpersonal boundaries and a history of arrest and incarceration. Humphrey noted the progress that the respondent had achieved but expressed skepticism about markedly

increased contact between her and her children within the next one to two years. He stated that he did not recommend reunification, or even consideration of reunification in the near future, due to the fact that the respondent's problems were deep seated and ingrained. At the trial, Humphrey explained that the respondent should be reassessed six months after her reentry into the general community. Humphrey also testified that, given the respondent's history, the likelihood of her relapse to drugs, alcohol or abusive relationships was very high.

The court, in its memorandum of decision, made the following findings. Although the respondent had made significant personal progress, she had not established the ability to maintain herself in the community. She had not completed a recognized program in domestic violence prevention or parenting education. She was not employed, and she lacked any significant employment history. It was unclear whether and how the respondent's mental health problems identified by Humphrey were addressed and resolved at the program. The respondent was living within the "protective womb" of the program and, twenty months after the child's removal, was perhaps on a track toward self-sufficiency, but she was not yet self-sufficient or capable of living in the community. On the date the petition was filed, the respondent completed eight months of an eighteen month program and, therefore, was more than one year away from possible reunification with the child. The transformation that occurred through her participation and partial completion of the program did not translate into rehabilitation sufficient to render her capable of caring for the child because the program she was undergoing focused on personal, as opposed to parental, rehabilitation. The respondent had not demonstrated that she could live in an unstructured environment on her own or cope with the burdens of child

rearing. The court also found that placing a child with her could cause her to relapse.

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. . . .

"A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of the trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority when reviewing the findings of a judge, is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence. . . . The question for this court . . . is not whether it would have made the findings the trial court did, but whether in view of the evidence and pleadings in the whole record it is left with the definite and firm conviction that a mistake has been committed. . . .

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition.

. . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child. . . .

"Personal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Citation omitted; internal quotation marks omitted.) *In re Cheila R.*, 112 Conn. App. 582, 589–91, 963 A.2d 1014 (2009).

We reject the argument that the court disregarded evidence of the respondent's progress. To the contrary, the court discussed her progress in its decision. Evidence of the respondent's personal progress alone, however, does not lead us to conclude that the court's finding that she had failed to achieve the required degree of rehabilitation was clearly erroneous. See, e.g., *In re Jennifer W.*, 75 Conn. App. 485, 499, 816 A.2d 697 (court makes inquiry into full history of respondent's

parenting abilities although respondent made significant strides in drug rehabilitation in year preceding termination proceedings), cert. denied, 263 Conn. 917, 821 A.2d 770 (2003). The respondent is also correct that, at her request, Youth Challenge was listed as a recommended service provider in the specific steps ordered by the court. Our Supreme Court, however, has recently held that "[i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department. . . . Accordingly, successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." (Internal quotation marks omitted.) *In re Melody L.*, 290 Conn. 131, 150–51, 962 A.2d 81 (2009).

The court in the present case acknowledged the respondent's progress but accorded greater weight to the following findings, which are clearly supported by the record. The court found that the respondent had a long history of parental failure and mental health and behavioral issues, that she did not demonstrate self-sufficiency or the ability to function outside of the confines of the program, that her chances of relapsing were high and that it was unclear how many of her mental and behavioral issues were addressed and resolved at the program. "Our function as an appellate court is to review and not retry the proceeding of the trial court. . . . The probative force of conflicting evidence is for the trier to determine." (Internal quotation marks omitted.) *In re Janazia S.*, 112 Conn. App. 69, 99, 961 A.2d 1036 (2009).[6]

---

[6] The respondent also challenges the court's finding that she "released" her children by entering into the program. This finding is not critical to the court's determination that the respondent had failed to achieve a sufficient degree of rehabilitation, but it deserves to be addressed. Although the court's

We next address the respondent's argument that the court improperly found that her rehabilitation was not foreseeable within a reasonable time.[7] The statute requires that the court analyze the respondent's rehabilitative status as it relates to the needs of a particular child. See, e.g., *In re Trevon G.*, 109 Conn. App. 782, 789, 952 A.2d 1280 (2008). "What constitutes a reasonable time is a factual determination that must be made on a case-by-case basis." (Internal quotation marks omitted.) *In re Halle T.*, 96 Conn. App. 815, 838, 902

observation that the respondent "knew she was letting her children go" or "released them" is not entirely clear, we conclude that the evidence clearly shows that the respondent was aware that her participation in Youth Challenge jeopardized her reunification efforts. Throughout the respondent's pregnancy, and between the child's birth in August, 2006, and the respondent's enrollment in Youth Challenge in January, 2007, she refused the department's offers to enroll in programs in which she could reside with at least one child.

It is undisputed that when the respondent entered Youth Challenge in January, 2007, she knew that she would not be able to reside with the child, who was then an infant, for the next twelve to eighteen months. The evidence shows that the respondent was informed in February and March, 2007, that Youth Challenge was not appropriate for the purposes of her reunification with the child because she and the child were not bonding. In March, 2007, six months prior to the filing of the petition, the department provided the respondent with the names, addresses and telephone numbers of four programs in which she could have her children with her, but the respondent stated that she believed in Youth Challenge and wanted to remain in it.

[7] The respondent's arguments challenging this particular finding are primarily directed at the reasoning the court outlined in the articulation of its denial of the respondent's motion to stay execution filed on August 11, 2008, four months after the court issued the memorandum of decision. We do not reach the merits of the respondent's arguments that challenge the court's findings and reasoning in the articulation. It is not our role to speculate that the court's views and legal analysis expressed in the articulation of its denial of a motion to stay informed its findings in the memorandum of decision, specifically its finding that the respondent had failed to achieve sufficient personal rehabilitation. See *Seligson* v. *Brower*, 109 Conn. App. 749, 757, 952 A.2d 1274 (2008) ("[w]here the factual basis of the court's decision is challenged we must determine whether the facts *set out in the memorandum of decision* are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous" [emphasis added; internal quotation marks omitted]). Furthermore, the respondent moved this court for a review of the court's order denying her motion to stay execution, and this court granted her motion but denied the requested relief on September 17, 2008.

A.2d 670, cert. denied, 280 Conn. 924, 908 A.2d 1087 (2006). The record shows that the court relied on Humphrey's determination that the respondent, subsequent to completing the program, would have to maintain herself outside of the program for a minimum period of six months before her situation could be reassessed. In addition to considering the respondent's personal and parental history, the court considered the child's young age, the bond the child had developed with her foster parents, and the child's emotional, physical and developmental needs. Under the present circumstances, the child would be required to spend the first few years of her life at a foster home, waiting for the respondent possibly to assume parental responsibilities and building a bond with the foster family, which could be disrupted when the child is a toddler. We cannot conclude that the court's finding that, considering the child's age and need for permanency, the respondent's rehabilitation was not foreseeable within a reasonable time is clearly erroneous. See *In re Janazia S.*, supra, 112 Conn. App. 96 (court considered properly that in light of child's emotional problems and need for permanency, respondent's ongoing work toward independent living was not far enough along for reunification to be possible).

We therefore conclude that the court did not improperly find that the respondent had failed to achieve such degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the child's life.

## II

The respondent's second and final claim is that the court improperly considered the best interest of the child, a factor properly considered only in the dispositional phase of termination proceedings, when it found

that she had failed to achieve a sufficient degree of rehabilitation.[8] The gist of the respondent's argument is that there is no evidence that the respondent was incapable of caring for the child and that the court, in finding that she had not achieved a required degree of rehabilitation, improperly considered the child's interest in permanency and stability with the foster parents. We are not persuaded.

The following additional facts are necessary for our consideration of the respondent's claim. The court made findings in its memorandum of decision regarding the amount of care required to raise a child. It extensively discussed the elements of physical care, such as feeding, bathing and changing. It also credited Humphrey's testimony regarding an infant's psychological needs and described the importance of emotional aspects of child development, such as hearing soothing and comforting familiar voices. The court addressed adjudication and disposition in separate sections of its memorandum. In the adjudication section, the court found that "given the age and needs of the child, further delay is unacceptable. The past twenty months have been, in fact, a lifetime for this child. The child requires permanency now, not when she is nearly three years old. [The child] should not be required to wait for nine more months on the chance that [the respondent] will survive in the community, and then absorb the possible horror of horrors caused by disruption from the people she knows as parents, displacement from the only home

---

[8] As we noted previously: "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Anthony A.*, 112 Conn. App. 643, 648, 963 A.2d 1057 (2009).

she has ever known, to be placed with a person whose demonstrated parenting has been historically very neglectful and whose mental health issues have not been appropriately addressed." In the dispositional phase, which the respondent does not challenge on appeal, the court considered whether the termination of parental rights was in the child's best interest.

We agree with the respondent that "a judicial termination of parental rights may not be premised on a determination that it would be in the child's best interests to terminate the parent's rights in order to substitute another, more suitable set of adoptive parents. Our statutes and caselaw make it crystal clear that the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence. . . . [A] parent cannot be displaced because someone else could do a better job of raising the child." (Citations omitted; internal quotation marks omitted.) *In re Baby Girl B.*, 224 Conn. 263, 280, 618 A.2d 1 (1992). The court, however, is statutorily required to determine whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, *considering the age and needs of the child,* such parent could assume a responsible position in the life of the child . . . ." (Emphasis added.) General Statutes § 17a-112 (j) (3) (b) (ii).

It is clear from the court's memorandum that the court placed great emphasis on the child's young age and the fact that she had resided with the same foster parents since birth. The court stated in the adjudication section of its memorandum that "given the age and needs of the child, further delay is unacceptable." Evidence demonstrates that the child, who had resided with the foster parents who have wanted to adopt her since her birth, would be two or three years old before the respondent's situation could even be reevaluated.

The child would develop an even stronger bond with the foster parents, making the severance of that bond more difficult for the child. We conclude that the court did not improperly consider the child's best interest during the adjudication phase but that it properly considered the child's young age and need for permanency in finding that the respondent's rehabilitation was not foreseeable within a reasonable time. See *In re Janazia S.*, supra, 112 Conn. App. 96 (court properly considered child's emotional problems and need for permanency in adjudication phase); *In re Samantha C.*, 268 Conn. 614, 629, 847 A.2d 883 (2004) (sufficient evidence supported court's finding that respondent failed to achieve rehabilitation in light of amount of time child spent in temporary care and its need for permanency). We therefore conclude that the court did not improperly consider the best interest of the child in the adjudication phase of the proceeding.

The judgment is affirmed.

In this opinion the other judges concurred.