******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

McDONALD, J., with whom ZARELLA and ROB-INSON, Js., join, concurring. A complete, contextual review of the trial court's memorandum of decision compels the conclusion that the court improperly compared the superior parental attributes of the foster mother, Paula M., with the wanting parental attributes of the respondent, Marjorie H., the mother of the minor children, James O., Jr., and Jolene O. Although I fully acknowledge that there is nothing in the record that would suggest that the trial court intended to draw that comparison, the plain words contained in the memorandum of decision reveal that, at the very least, it unconsciously did so. Regardless of that error, the trial court's findings as to the respondent, in and of themselves, require affirmance of the judgment.

As the majority properly recognizes, it is "essential, in considering a petition to terminate parental rights, to sever completely the issues of whether termination is statutorily warranted and whether a proposed adoption is desirable." (Internal quotation marks omitted.) *In re Baby Girl B.*, 224 Conn. 263, 275, 618 A.2d 1 (1992). This is so because petitions "for termination of parental rights are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents and therefore to reach a result based on such comparisons rather than on the statutory criteria." *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 672–73, 420 A.2d 875 (1979).

The requirement that the trial court conduct a hearing on a petition for termination of parental rights in two distinct phases—the adjudicatory phase, at which the trial court determines whether a statutory ground for termination of parental rights exists, and the dispositional phase, at which the trial court determines whether termination is in the best interest of the child; *In re Shane M.*, 318 Conn. 569, 582–83 n.12, 122 A.3d 1247 (2015);—is intended to safeguard against such improper considerations tainting the threshold inquiry. Accordingly, during the adjudicatory phase, it is per se improper for a trial court to compare the attributes of a natural parent with those of a prospective parent.[1] *In re Baby Girl B.*, supra, 224 Conn. 280.

In the present case, the trial court's memorandum of decision was divided into four substantive parts: general findings of fact, a determination of whether the Department of Children and Families made reasonable efforts to reunify the respondent's family, a determination on the adjudicatory matter, and a determination on the dispositional matter. The court made specific findings of fact in support of each part. In the part

resolving the adjudicatory matter, it clearly was proper for the trial court to analyze the respondent's rehabilitative status in relationship to the needs of her children. See *In re Shane M.*, supra, 318 Conn. 585; see, e.g., *In re Shyliesh H.*, 56 Conn. App. 167, 173, 743 A.2d 165 (1999). The court, however, also found certain facts that had no bearing on that essential issue. The court found that Paula M. and a social worker were "individuals whom the children deeply trust" and observed that they "care greatly for these children and have therefore earned the trust of these very emotionally fragile and otherwise guarded children . . . ." The court also found that the "children want to remain in Paula M.'s home and be adopted by [her] . . . ." The court further concluded that "the children have made extraordinary progress while living with Paula M., in an environment that is calm and understanding of the children's needs. . . . As the children's progress, relationship and work with Paula M. makes clear, the process of healing and recovery must also occur in a home environment which the children have come to learn is safe and caring." The court then stated: "*Given Paula M.'s training and participation in therapy sessions*, it is clear that [the therapeutic] process cannot be limited to the one hour per week session that a child has, even with a trusting therapist. *In contrast*, [the respondent] is volatile and prone to violence, unable to set appropriate limits, unwilling to talk with the children's therapists and therefore, unable to help them use coping skills to manage their anxiety and ultimately, unwilling to believe the children's statements regarding the trauma." (Emphasis added.) I must take the trial court's unambiguous comparison at face value. Whether this was a conscious comparison by the court or an inartful choice of words to compare the respondent to Paula M., the plain language of its decision evidences that such a comparison was made.

The trial court's findings in its introductory part of the decision, although not limited to the issue in the adjudicatory phase, lend further support to this conclusion. See *Olson* v. *Mohammadu*, 310 Conn. 665, 682, 81 A.3d 215 (2013) (determinative factor when interpreting trial court's memorandum of decision "is the intention of the court as gathered from all parts of the judgment" [internal quotation marks omitted]). The court repeatedly recited evidence discussing the positive attributes of Paula M.: "Paula M. attended therapy consistently every week and embraced as much education as possible in order to understand and help Jolene and [James] through their symptoms," and Mimi Akhand, James' therapist, observed "that the foster mother must be both firm with [James] but also very calm, warm and supportive of him. . . . Akhand noted that [Paula M.] is very skilled in this way and is also very good at processing with [James] his conduct when he misbehaves. . . . Akhand described [Paula M.] as being very

understanding and very patient with [James]." While these findings can be construed as *implicitly* addressing the children's needs, they *expressly* emphasize Paula M.'s positive attributes. The absence of any reference to these facts in the dispositional part of the decision, along with the presence of similar references in the adjudicatory part of the decision, further demonstrates that Paula M.'s attributes influenced the court's decision in the adjudicatory phase.

I recognize that certain statements read in isolation might be subject to an alternative interpretation, but the totality of the statements and the clear expression of comparison—"In contrast"—compel the conclusion that the trial court improperly compared Paula M. with the respondent. I would therefore conclude that the trial court improperly injected the dispositional issue of the children's best interests analysis into the adjudicatory phase of its decision.

This concern, unfortunately, is not limited to the present case. The Appellate Court has repeatedly addressed similar claims, but ultimately construed language that is susceptible to suggesting a comparison in the manner that the majority does in the present case. See, e.g., *In re Gabriella A.*, 154 Conn. App. 177, 191–94, 104 A.3d 805 (2014) (court allegedly considered best interest of child in adjudicatory phase), aff'd on other grounds, 319 Conn. 775, 777, 127 A.3d 948 (2015); *In re Brian T.*, 134 Conn. App. 1, 18–21, 38 A.3d 114 (2012) (same); *In re Zion R.*, 116 Conn. App. 723, 736–39, 977 A.2d 247 (2009) (same); *In re Janazia S.*, 112 Conn. App. 69, 93–96, 961 A.2d 1036 (2009) (same). Given the fundamental right at stake, it is incumbent upon our courts to make abundantly clear that they are not engaging in such improper comparisons. See *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 673 (quoting passage from United States Supreme Court decision that "forcefully recognized th[e] danger" of comparing advantages of child's natural parents with prospective adoptive parents).

Having concluded that the trial court's comparison was improper, I must consider whether this impropriety was harmless.[2] E.g., *In re Elvin G.*, 310 Conn. 485, 512–13, 78 A.3d 797 (2013) (applying harmless error analysis in termination of parental rights case), overruled in part on other grounds by *In re Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015). Even assuming, without deciding, that the petitioner, the Commissioner of Children and Families, would bear the burden of demonstrating harmlessness beyond a reasonable doubt; *State* v. *Artis*, 314 Conn. 131, 159, 101 A.3d 915 (2014) (state bore burden of demonstrating harmlessness beyond reasonable doubt when impropriety was of constitutional magnitude); see also *In re Yasiel R.*, 317 Conn. 773, 782, 120 A.3d 1188 (2015) (termination of parental rights proceedings implicate constitu-

tional rights); that standard clearly is satisfied in this case.

The trial court's decision is replete with facts establishing that the respondent failed to rehabilitate, untainted by any comparison to Paula M. The court found, among other things, that the respondent: (1) "is a volatile and sometimes violent individual"; (2) never adequately addressed "her communication skills so that she could engage in cooperative relationships with professionals who provide services to her and her children"; (3) "failed to acknowledge responsibility for the conditions leading to the children's removal" such that the services offered to her "have essentially been ineffective"; (4) refused to communicate with her children's therapists; and (5) failed to acknowledge or appreciate the extent to which either domestic violence and substance abuse have been a significant source of trauma to her children or the significance of her children's behaviors, in and of themselves. Most significantly, the court found that the respondent "has *none* of the qualities the children have required to stabilize and to continue to heal from the traumas they experienced while in their parents' care." (Emphasis added.)

Thus, it is clear that, even without considering the favorable attributes of Paula M., the court necessarily would have concluded that the respondent "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of [her children, she] could assume a responsible position in" their lives. General Statutes (Rev. to 2013) § 17a-112 (j) (3) (B); see also *In re Etta H.*, 146 Conn. App. 751, 759, 78 A.3d 295 (2013) (although "the standard is not full rehabilitation, the parent must show more than any rehabilitation" [internal quotation marks omitted]). I therefore respectfully concur in the judgment.

[1] I do not intend to suggest that it is always proper to make such a comparison at the dispositional phase.

[2] I am not persuaded by the respondent's various contentions that the trial court's impropriety is not subject to harmless error analysis. First, even assuming that the impropriety was clear and obvious, it did not result in a manifest injustice in light of the trial court's other, proper findings that I subsequently discuss, and thus does not warrant automatic reversal under the plain error doctrine as the respondent contends. *State* v. *Jamison*, 320 Conn. 589, 596–97, 134 A.3d 560 (2016) ("party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice"). Second, contrary to the respondent's contention, the impropriety in this case did not constitute structural error because it did not render the hearing fundamentally unfair in light of those same findings. *State* v. *Lopez*, 280 Conn. 779, 791, 911 A.2d 1099 (2007) (structural errors "render a trial fundamentally unfair" [internal quotation marks omitted]). Finally, even assuming the trial court's improper comparison constituted a due process violation, harmless error analysis would still apply notwithstanding the respondent's argument to the contrary. *In re Steven M.*, 264 Conn. 747, 762, 826 A.2d 156 (2003) (Fundamental "fairness required that the trial court hold a competency hearing. The failure to hold such a hearing in the present case, however, was harmless.").