******************************************************************

The ''officially released'' date that appears near the beginning of this opinion is the date the opinion was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

This opinion is subject to revisions and editorial changes, not of a substantive nature, and corrections of a technical nature prior to publication in the Connecticut Law Journal.

******************************************************************

IN RE COREY C., JR.*
(AC 43478)

Keller, Prescott and Pellegrino, Js.

*Syllabus*

The respondent father appealed to this court from the judgment of the trial court terminating his parental rights with respect to his minor child. The father claimed, inter alia, that the court erred in concluding that he failed to achieve a sufficient degree of personal rehabilitation, as required by statute (§ 17a-112 (j) (3) (B) (i)), that would encourage the belief that, within a reasonable time, he could assume a responsible position in the child's life. He further claimed that the Department of Children and Families did not make reasonable efforts to reunify him with the child. The child previously had been adjudicated neglected, committed to the care and custody of the petitioner, the Commissioner of Children and Families, and, thereafter, placed with foster parents. During the neglect proceeding, the father was issued specific steps to take to bring about his reunification with the child. As part of its efforts to reunify the father with the child, the department referred the family to a therapeutic family time program to improve their parenting skills and ability to interact with each other and with the child. A worker with that program provided the parents with materials on the effects of thirdhand smoke and reviewed the materials with them in their weekly meetings in order to address the effects of the mother's heavy smoking on the child's asthmatic condition. The trial court found that the department had made reasonable efforts to reunify the child with the father but that he was unable or unwilling to benefit from those efforts. *Held*:

1. The evidence was sufficient to support the trial court's finding that, under the totality of the facts and circumstances, the department made reasonable efforts to reunify the respondent father with the child and that he was unable or unwilling to benefit from its reunification efforts:
   a. The department offered the parents adequate feedback with respect to their participation in the therapeutic family time program, as a worker assigned to the respondent's family provided feedback after each of nine weekly visits with the parents and the child and participated with a department social worker in two other meetings to review their progress with regard to parenting skills, and, contrary to the father's assertion, the parents were provided educational tools to help them stop smoking, which were reviewed with them, and were advised how their smoking adversely affected the child's health, as it was explained to the father that the smell of smoke in clothes and hair could trigger the child's asthma, the father was told that the child's pediatrician had reported that thirdhand smoke from the parents' visits with the child was impacting the child's health, and the child's pulmonologist determined that thirdhand smoke from the parents' clothes and belongings aggravated the child's symptoms during a visit on the day that the parents told a therapeutic family time worker that they were quitting smoking; furthermore, the father admitted that he and the mother repeatedly were urged to stop smoking, the parents' several representations that they were attempting to quit or had quit smoking undermined the father's claim that the department should have recognized a need for further intervention, and, as there was no evidence that the father asked the department for smoking cessation services, his failure to request such services undermined his claim that those services were part of what the department should have provided as part of its reasonable efforts to reunify him with the child.
   b. This court did not need to reach the merits of the respondent father's claim that the trial court improperly found that he was unable or unwilling to benefit from the department's reasonable efforts to reunify him with the child, as the trial court's finding that the department made reasonable efforts was sufficient to satisfy § 17a-112 (j).

2. The respondent father could not prevail on his claim that the evidence was insufficient to support the trial court's conclusion that he failed to rehabilitate himself, which was based on his assertion that the court's

factual predicates for that conclusion were clearly erroneous: the court's subordinate factual findings were supported by the evidence and the rational inferences to be drawn therefrom, as the father's eight minute struggle to put the child in a car seat, which was observed by the psychologist who had evaluated him, and which is a basic parenting skill, raised concerns about and shed light on his ability to adequately care and provide for a child, the father was unable or unwilling to change the mother's smoking habits, as he was aware that he and the mother did not adhere to instructions about the dangers smoking posed to the child but failed to disclose that lack of compliance, the father had a sporadic history with individual counseling, as he discontinued his therapy for a significant period of time, despite its having been a requirement of the specific steps he was issued, the court made no suggestion that the father suffered from past mental health diagnoses and substance abuse at the time of the trial, the father had no clear parenting plan for the child if reunification were to occur, despite having discussed day care for the child while he was at work, as there was no evidence as to which day care the child would attend or who would pay for it or provide transportation, and the mother, who worked as a live-in companion, provided no clear idea about what her employment would consist of, the parents had a history of difficulties together and failed to complete couples counseling, their Facebook pages contained allegations of infidelity and discussion of potential separation, and department workers witnessed several arguments between them, the evidence at trial that related to the mother and to the father's involvement with and knowledge of her significant parenting issues was relevant to whether he had rehabilitated, as he demonstrated poor judgment and undermined any prospect of the child's being reunified with him by failing to develop a plan to protect him from the mother's deficient parenting, and the parents' continued smoking or the father's tolerance of the mother's smoking created an unacceptably risky home environment for the child that was indicative of an inability to prioritize the child's needs.

3. The respondent father could not prevail on his claim that the trial court, in its adjudicatory findings, improperly compared his suitability as a parent, and that of the mother, to that of the foster parent; the court used the comparison between the foster parent and the father and the mother to highlight the child's emotional and developmental needs, as the majority of the court's comparison involved the mother, the court's reference to the lack of warmth the child showed with the mother compared with that he showed with the foster parent was made on the basis of what the therapeutic family time professionals determined were the child's specific needs, and the court's comparison, when viewed as a whole, focused on the child's needs and the inability of the father and mother to meet those needs.

Argued March 2—officially released June 8, 2020**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of New London, Juvenile Matters at Waterford, and tried to the court, *Driscoll, J.*; thereafter, the court denied the respondent father's motion to revoke the commitment of the minor child to the petitioner; judgment terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed.*

*Benjamin M. Wattenmaker*, assigned counsel, for the appellant (respondent father).

*Evan O'Roark*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

KELLER, J. The respondent, Corey C., appeals from the judgment of the trial court terminating his parental rights with respect to his biological minor son, Corey C., Jr., pursuant to General Statutes § 17a-112 (j) (3) (B) (i).[1] The respondent claims that the court improperly (1) concluded that the Department of Children and Families (department) made reasonable efforts to reunify him with Corey and that he was unable or unwilling to benefit from the department's reunification efforts, (2) concluded that he failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering Corey's age and needs, the respondent could assume a responsible position in Corey's life, and (3) compared his suitability as a parent, and that of Corey's biological mother, to that of Corey's foster parent during the adjudicatory phase of the termination proceeding. We affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. Corey was born on September 28, 2017. On October 4, 2017, the petitioner, the Commissioner of Children and Families (commissioner), filed a neglect petition and obtained an ex parte order of temporary custody of Corey. In the neglect petition, the commissioner alleged predictive neglect, given the fact that the parents were married and living together, had an unstable relationship, mental health and substance abuse issues, and the mother had failed to care safely for her first two children. The order of temporary custody was sustained by agreement. On March 6, 2018, the respondent and the mother submitted written pleas of nolo contendere, and Corey was adjudicated neglected and committed to the care and custody of the commissioner. Prior to and following Corey's commitment, the department provided services to the respondent and the mother.

Subsequently, a petition to terminate parental rights was brought against the respondent and the mother. On April 11 and May 2, 2019, a termination of parental rights trial was held before the trial court, *Driscoll, J.* The court granted the petition and terminated the parental rights of the respondent and the mother.[2]

In its memorandum of decision, the court found the following adjudicative facts under the clear and convincing evidence standard of proof: "[Corey] was born on September 28, 2017, to the . . . mother and [the] respondent. [The] [m]other had two older children, both of whom were removed from [the] mother's care. Guardianship of [the] mother's firstborn was transferred to [the] maternal grandmother, with whom [the] mother has a conflicted relationship. [The] [m]other's parental rights [as to] her second son were terminated with [the] mother's consent, and the child was adopted

by a relative of [Corey's] father. [The respondent] is not the biological father of the adopted child but was [the] mother's boyfriend and emotional support throughout the termination and adoptive process. [The] [m]other lost both children due to concerns about her mental health, her parental shortcomings, and her history of substance abuse.

"[The] [m]other, by history, has mental health diagnoses, including bipolar disorder with psychotic features, anxiety, depression, and obsessive compulsive disorder. She was inconsistent in her mental health treatment and medication management. She also has a history of substance abuse, including opiates, heroin, marijuana, and K2 [synthetic marijuana]. She has a history of anger management issues and threatening behavior. The fiancé of the adoptive mother obtained a full, no contact protective order against [the] mother, which was in effect from February, 2016, until February, 2017.

"[The respondent], by history, has mental health diagnoses, including bipolar disorder, sociopath, intermittent explosive disorder, and he has been hospitalized psychiatrically on four occasions. [The respondent] has a substance abuse history, including Percocet, morphine, and Klonopin abuse. He, too, has a conflicted relationship with his mother. He has a criminal history dating back to 2004, with his most recent conviction based on an October, 2014 arrest. He completed a five year term of probation in July, 2017. He self-reported significant health care issues.

"Staff from the Lawrence + Memorial Hospital [in New London] notified the department that [the] mother had given birth to [Corey]. Due to the difficulties the parents had in their relationship, their own mental health issues, and their lack of parenting skills, an agreement was made that [the] parents and [Corey] would reside with relatives and be supervised at all times with [Corey].[3] A considered removal meeting was held on October 3, 2017. On October 4, 2017, the petitioner filed a neglect petition and obtained an ex parte order of temporary custody . . . of [Corey] based on . . . predictive neglect. [Corey] remained with the relatives.[4] The parents were served, appeared in court, were advised of their rights, and appointed counsel. The order of temporary custody was sustained by . . . agreement. An updated psychological evaluation was ordered to be done by [Nancy] Randall [a licensed psychologist]. [Randall] previously [had] done one of [the] mother and the [respondent], [and] then [the] mother's boyfriend, in connection with the prior termination case for [the] mother's second child.

"[Randall's] report was dated February 13, 2018. [Randall] found [the] mother's prior diagnosis of bipolar disorder with psychotic features to be appropriate, and that [the] mother's panic disorder had improved and [that] there was no current evidence of obsessive com-

pulsive disorder. [The respondent], due to greatly reducing caffeine consumption, had eliminated signs of manic functioning, which may have led to a prior bipolar disorder diagnosis. [Randall] felt [that] a more accurate diagnosis was major depressive disorder, in remission. She felt [that] both parents were in need of continued individual therapy. [The] [m]other continued psychiatric care for medication management. Couples therapy was essential. Hands-on parenting was also necessary, with a focus for [the] mother on attachment. The parents demonstrated limited skills, particularly with the use of [Corey's] car seat. They needed more training in understanding their child's developmental and attachment needs.[5] [Randall] indicated that if the parents were able to demonstrate consistent emotional control and appropriate judgment, they could move forward toward reunification. However, [Corey] could not be left in their care if they have incidents of emotional outbursts, domestic violence, or [of] becoming too overwhelmed to attend to his needs. She felt [that] the reunification process should be extended with close monitoring of their parenting.[6]

"On March 6, 2018, [the] mother and [the respondent] submitted written pleas of nolo contendere, [and Corey] was adjudicated neglected and committed to the [care and custody of the commissioner] . . . until further court order. [Corey] has been in the [commissioner's] care and custody since the October, 2017 order of temporary custody. The parents were issued specific steps[7] [pursuant to General Statutes § 46b-129] to address their reunification needs.

"[The] [m]other and [the respondent] have met several of their steps. They have maintained consistent housing in a one bedroom home. They have maintained stable employment, though their employment would make a parenting plan difficult. [The respondent] works long hours, some weeks up to seventy hours,[8] and the mother works as a live-in companion in [a] client's home. [The] [m]other stays [at the client's home] from Thursday through Sunday and sleeps in the home. Her agency had begun the process of firing [the] mother in January, 2019, but reconsidered at the request of the client.

"The parents indicated that the multiple days of separation every week reduced the likelihood of relationship discord. While the parents present as a committed couple, they have had a history of difficulties. In 2015, [the] mother moved in with another man for approximately three months. [The] [m]other describes [the respondent] as very jealous of any interactions between [the] mother and other men. At an intake for Sound Community Services, in August, 2018, [the] mother said her long-term goal was . . . 'becoming a healthier person, change myself from cheating to being the wife that my husband wants me to be.' [The] [m]other and [the

respondent] did not begin couples counseling until July, 2018. There is no record of successful completion of couples counseling. The parents' Facebook pages posted in August, 2018, contain allegations of infidelity and potential separation. Several arguments have been observed by the department.

"[The] [m]other has been inconsistent in her individual therapy. She began counseling with Sound Community Services and remained with [it] until February, 2018, when she discontinued treatment. She resumed individual therapy in August, 2018. At the time of trial, her history of therapeutic engagement was inconsistent. She was doing outpatient therapy approximately one time a month, much less than required, and she advised [the department] that she did not know her therapist's name. She did appear more emotionally stable, but the court has concerns about her insight into her treatment, particularly when [the] mother advises providers that if she does not reunify with her child, all of this therapy would have been a waste of time. This demonstrates a lack of insight into her own mental health needs. . . .

"[The respondent] also has a history of sporadic compliance with individual counseling. [Stephanie] Gill-Manville was [the respondent's] clinician [at Sound Community Services] from 2013 until [2017]. She, like Randall, saw no need for medication for [the respondent]. [The respondent], without advice, discontinued individual therapy in February, 2018, and did not resume until October, 2018. He had not been successfully discharged or released from the reunification step. Since October or November, 2018, [the respondent] has resumed counseling at Sound Community Services. [Peggy Ann Nelson], [the respondent's] individual therapist, has included [the] mother in some sessions. [Nelson] said [the respondent] has been candid about difficulties in their relationship but believes that [the] mother and [the respondent] were strongly attached and united as a couple. She was unable to opine on [the respondent's] parenting, as she has never seen him with [Corey], but she knows he wishes to be an active parent. He has not been discharged. It does not appear that [the respondent] has sufficient insight into the negative effect [that the] mother's mental health has on her parenting, despite [the respondent's] substantial period of individual counseling.

"Most important in determining rehabilitation are issues relative to parenting and visitation. The parents indicated that they had a strong desire to parent [Corey] during the critical period of [his] infancy. The department on four separate occasions in November, 2017, and December, 2017, offered to the parents an additional supervised weekly visit. The parents declined. Even more telling, with respect to the parents' interest in [Corey], was the fact that [Corey] was in the relative foster home, [which] had adopted [the] mother's second

child, and was related to [the respondent]. [The] [m]other and [the respondent] were given the opportunity to call the home to check on [Corey] but failed to do so.

"The department referred the parents to Kids [Advocates, LLC], a supervised visitation and parenting education program. The provider reported that the parents were essentially passive and that [the] mother, in particular, did not make eye contact or interact with [Corey]. [The] [m]other needed frequent redirection and instructions to meet [Corey's] basic needs and often disregarded the suggestions. [The] [m]other had trouble soothing [Corey] when [he was] fussy and often passed him to [the respondent]. Limited progress was made by the parents. In March, 2018, the department referred the family to the Child & Family Agency [of Southeastern Connecticut, Inc.] for its therapeutic family time (TFT) program.[9] [Elizabeth Keniston, the TFT community worker assigned to work with the family] noted limited to moderate progress.[10] It took a long time to teach [the] mother not to let [Corey] pick things up off the ground and put them in his mouth, with [the] mother often attempting to justify the cleanliness of the item. [The] [m]other reported her difficulty in soothing a fussy baby and expressed a concern that her [post-traumatic stress disorder] would kick in[11] and put [Corey] at risk. [The respondent] expressed a concern that all this work would be a waste of time if they didn't get [Corey] back. [Keniston] noted a lack of affect by [Corey] in the parents' company, especially with [the] mother. She contrasted this with the warmth and attachment observed between [Corey] and [the] foster parent. At times, [Keniston] had difficulty redirecting [the] mother's attention from [the] mother's cell phone to [Corey]. [The] [m]other complained of having to carry [Corey] in the car seat, as it was too heavy for her. [The] [m]other asked the worker to carry the baby instead. On one visit to the beach, while [Corey] was sitting with [the] mother, [he] fell face forward into the sand, and it required [the respondent] to tell [the] mother to pick up [Corey]. At another outdoor visit, on a cloudy day, [Corey] became sunburned, much to the embarrassing chagrin of [Keniston]. [Keniston] noted, however, that neither parent assumed any shared responsibility for the failure to protect [Corey] and apply sunscreen. The parents were unable to provide a clear plan for [Corey] if reunification occurred. [The respondent] indicated that [the] mother would never be left home unsupervised with [Corey] but did not have a reasonable plan for who would supervise [him] while he was working up to seventy hours per week. He also indicated that the proposal was being done to satisfy the department, as he had no concern [about the] mother['s] being alone with [Corey] despite [the] mother's demonstrated, limited parenting skills. [The] [m]other did complete a brief parenting program with Catholic Charities

but the court finds no evidence that it was effective.

"TFT recommended against reunification and closed its file.[12] At the conclusion of [the] assessment, [it] determined not to proceed further. The major example of parenting deficits, which was of great concern to the program, and of great concern to the court, was the parents' wholly inadequate response to [Corey's] medical needs. [Corey] has a serious asthmatic condition. He is being treated by Nutmeg Pediatric Pulmonary Services [in Branford]. The parents have been advised that it is particularly important for [Corey] to be in a smoke-free atmosphere, which includes eliminating secondhand[13] smoke exposure transferred from clothing or upholstery. He has difficulty breathing, increased coughing, and heightened fussiness after visiting with his parents. They have been repeatedly urged to stop smoking or, if not, to shower and change into clean clothes, [to] not [drive] in a car in which they've been smoking, and to walk to visits for further airing, if necessary. Despite frequent admonitions, [Corey's] physical reaction to visits indicates ongoing exposure to secondhand smoke.[14] [The] [m]other insisted that she quit smoking as of January, 2019. [Gail Hooper, the department social] worker, credibly testified that she saw numerous cigarette butts outside the private entry to the parents' home and smelled . . . stale smoke in the home. [Although the] mother testified that she had stopped smoking, in her own exhibit G, a clinical summary from Sound Community Services of an encounter with [the] mother on April 8, 2019, [the] mother disclosed that she was a heavy tobacco smoker from January 3, 2017, to the present . . . . [The respondent] is unable or unwilling to change [the] mother's smoking habits and make the environment safe for [Corey]. This, to the court, is the most definitive example of the parents' lack of insight into [Corey's] needs.

"Finally, the court can, and does, give added weight to the opinions of Randall, who was recognized as an expert. In 2018, Randall found both parents to be more emotionally stable than when she saw them in 2014, but she did not feel [that] either parent was invested in the extra work it takes to create an attachment. She opined at trial that the parents had not rehabilitated and that [Corey] would be at emotional risk if [he were] returned to them and at medical risk as well. She testified that the TFT program was exactly the kind of program [that the] mother needed. As noted, that program recommended against reunification. Randall persuasively testified that the parents are each other's primary supports, and, given their troubled relationship, there is increased risk of conflict and fighting. If [the] mother were to lose [the respondent's] support, she could become disregulated emotionally, with a potential for risk to any child in her care. She said the prognosis for reunification was not good and [that] it would not be in [Corey's] best interest to deny him a stable, permanent

home. Thus, she opined that termination of parental rights would be in [Corey's] best interest. The parents love their son and they wish to care for him, but they do not demonstrate the essential insight and parental skills. Neither parent demonstrates a desire or ability to be a single parent. The issue is not whether the parents have improved their ability to manage their own lives but whether they can manage their son's needs. Willingness does not equate to ability.

"The court finds by clear and convincing evidence that the department has proven its adjudicatory allegations, to wit, that it made reasonable efforts to reunify [Corey] with [the] mother and [the respondent], that [the] mother and [the respondent] are unable or unwilling to benefit from those efforts, that [Corey] was adjudicated neglected in a prior proceeding and that [the] mother and [the respondent] have each failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering their child's age and needs, that either parent could assume a responsible position in [Corey's] life." (Emphasis omitted; footnotes added.)

The court set forth findings with respect to the seven criteria set forth in § 17a-112 (k).[15] With respect to the first criterion, the court found: "The parents were offered timely services, including supervised visitation, parenting education, psychological evaluation, individual and couples counseling, and the TFT program and assessment." With respect to the second criterion, the court found: "[The department] made reasonable efforts. The parents expressed concerns that the department did not engage in greater feedback from the department with respect to the reports of the providers. While this might be an optimum strategy, the issue is not whether the department made all possible efforts, but whether [it] made reasonable efforts. The referrals made, especially to TFT, clearly were reasonable." With respect to the third criterion, the court found: "Reunification steps were set by the court on October 4, 2017, and March 6, 2018.[16] The parents' attempts and failures to comply are noted herein [previously]." (Footnote added.) With respect to the fourth criterion, the court found: "The parents love their son and wish to reunify. They were unable or unwilling to put in the effort at attachment. [The] [m]other, in particular, was not invested sufficiently. [Corey's] affect around them was flat or fussy and outside his normal behavior. He was exposed to physical discomfort when with his parents due to secondhand smoke exposure, aggravating his asthma. [Corey] is fully bonded to his foster parents, with whom he has been placed since March, 2018." With respect to the fifth criterion, the court found: "[Corey] is almost two years old, born September 28, 2017." With respect to the sixth criterion, the court found: "The parents have maintained reasonable contact with [Corey] and the department. The parents have improved

their personal circumstances favorably, but there is no reasonable prospect that they will be able to meet [Corey's] particular needs." With respect to the seventh criterion, the court found: "No such prevention was shown."

The court then made the following dispositional findings. "[Corey] has serious allergy and pulmonary needs. The parents are unable or unwilling to take the necessary measures to meet them. Further, the parents have shown limited progress in addressing those needs common to all children, specifically, attachment, and the child's interest in sustained growth, development, well-being, and continuity and stability of his environment. [Corey] is in a placement that can meet his needs and wishes to adopt. [Corey's] attorney advocates for termination so [he] can be adopted. As noted, there is a distinction between parental love and parental competence. The [petitioner] has proven by clear and convincing evidence that termination of parental rights is in [Corey's] best interests.

"Wherefore, after due consideration of [Corey's] need for a secure, permanent placement, and the totality of the circumstances, and having considered all statutory criteria, and having found by clear and convincing evidence that grounds exist to terminate [the] mother['s] and [the respondent's] parental rights as alleged, and that it is in [Corey's] best interests to do so, and having denied [the respondent's] motion to revoke commitment, the court orders:

"That the parental rights of the . . . mother . . . and the respondent father . . . are hereby terminated . . . ." This appeal followed.

I

We first address the respondent's claim that the court improperly concluded that the department made reasonable efforts to reunify him with Corey and that he was unable or unwilling to benefit from the department's reunification efforts.

Section "17a-112 (j) (1) requires that before terminating parental rights, the court must find by clear and convincing evidence that the department has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate . . . . Thus, the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate. . . . The trial court's determination of this issue will not be overturned on appeal

unless, in light of all of the evidence in the record, it is clearly erroneous." (Citation omitted; internal quotation marks omitted.) *In re Jonathan C.*, 86 Conn. App. 169, 172–73, 860 A.2d 305 (2004).

Our Supreme Court "clarified the applicable standard of review of an appeal from a judgment of the trial court pursuant to § 17a-112 (j). See *In re Shane M.*, 318 Conn. 569, 587, 122 A.3d 1247 (2015); see also *In re Gabriella A.*, 319 Conn. 775, 789–90, 127 A.3d 948 (2015). In those cases, the court clarified that '[w]e review the trial court's subordinate factual findings for clear error. . . . We review the trial court's ultimate determination that a parent has failed to achieve sufficient rehabilitation [or that a parent is unable to benefit from reunification services] for evidentiary sufficiency . . . .' *In re Gabriella A.*, supra, 789. We conclude that it is appropriate to apply the same standard of review of a trial court's decision with respect to whether the department made reasonable efforts at reunification. See id.; see also *In re Jorden R.*, 293 Conn. 539, 558–59, 979 A.2d 469 (2009). Accordingly, we conclude that we must review the trial court's decision in the present case with respect to whether the department made reasonable efforts at reunification for evidentiary sufficiency." *In re Oreoluwa O.*, 321 Conn. 523, 533, 139 A.3d 674 (2016).

"[Section 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous." (Internal quotation marks omitted.) *In re G.S.*, 117 Conn. App. 710, 716, 980 A.2d 935, cert. denied, 294 Conn. 919, 984 A.2d 67 (2009).

A

The respondent's claim that the court improperly found that the department made reasonable efforts to reunify him with Corey is premised on two arguments. First, the respondent argues that the department failed to offer any feedback to him and the mother in the TFT program, and, second, he argues that the department failed to offer any smoking cessation services to either of the parents. We disagree that the court improperly found that the department failed to make reasonable efforts to assist them in quitting smoking.

The record contains sufficient evidence on which to affirm the court's finding that the department made

reasonable efforts at reunification with respect to the specific factual findings of which the respondent complains. First, we conclude that the department offered both the respondent and the mother adequate feedback with respect to their participation and progress in the TFT program. Keniston, the TFT community worker assigned to supervise and instruct the respondent, the mother, and Corey, completed nine TFT visits with the parents and Corey and typically also met with the parents alone each week. At trial, Keniston testified that she provided the parents with feedback at each weekly visit. A series of detailed reports are in evidence that provide considerable detail as to discussions between Keniston and the parents. In addition to the weekly feedback provided to the parents after visits with Corey, the parents also participated in two provider meetings, in which Keniston and Hooper reviewed the parents' overall progress in the TFT program with respect to their parenting skills. Further, Hooper testified that, as part of the TFT program, the TFT workers "actually discuss [feedback] with the parents because goals are made at the beginning of the service with the parents. And then at each session they talk about how they did with those goals that were developed with the parents." We conclude that this evidence demonstrates that the respondent and the mother received adequate feedback at both provider meetings and weekly meetings with Keniston. Accordingly, we disagree with the respondent's argument that the department did not make reasonable efforts to reunify because it failed to offer any feedback to him or the mother with respect to their progress in the TFT program.

Second, we also disagree with the respondent's argument that the department did not make reasonable efforts to reunify because it failed to offer smoking cessation treatment to the respondent and the mother.[17] As aforementioned, the parents' smoking habits were of particular concern to the court, which found, on the basis of the evidence before it, that Corey suffers from asthma, bronchitis, and gastroesophageal reflux disease. There was evidence in a TFT meeting summary dated May 11, 2018, of the foster father reporting to the attendants at the meeting, which included the respondent, that following Corey's weekly TFT visits with the respondent and the mother, Corey's asthma symptoms were aggravated and the foster parents had to administer breathing treatments. The meeting's administrative case review facilitator, Cassandra Bunkley, explained to the respondent that the lingering smell of smoke in clothes and hair can trigger an infant's asthma. It was decided that the parents would not smoke three hours prior to the visits and would change their clothes. The mother, however, was not present at this meeting. On June 11, 2018, Keniston told the parents that Corey's pediatrician had reported to the foster parents that thirdhand smoke from visits was impacting Corey's

health. She provided them with materials on the effects of thirdhand smoke. The mother stated that the reason that she and the respondent smoke so much is because of the department and the stress that they are going through. It was determined that the parents would not bring any outside items to the visits, such as clothes and toys. Keniston noted that the parents expressed no understanding of the reasons for the smoking guidelines for visits. On June 18, 2018, the respondent and the mother informed Keniston that they were quitting smoking. There also was evidence that, although the respondent and the mother did not smoke during their supervised visits with Corey, Corey's pulmonologist, Regina M. Palazzo, after treating Corey for asthma related symptoms on October 1, 2018, determined that, during a visit that day, thirdhand smoke from the parents' clothes and belongings was the cause of Corey's exposure and aggravated symptoms. In her report discharging the parents from the TFT program, Keniston noted that the parents were "unable to take responsibility for the effect smoking has on [Corey] and instead shifted [blame to the department]."

The respondent argues that the department did not provide him or the mother with adequate smoking cessation services, and, therefore, the department did not make reasonable efforts to reunify the parents with Corey.[18] We disagree with the respondent for several reasons. First, in his brief, the respondent concedes that he and the mother were "repeatedly urged to stop smoking . . . ." Additionally, the evidence reflected that the respondent and the mother participated in weekly TFT meetings with Keniston. As part of these meetings, Keniston provided the respondent and the mother with printed material on the effects of thirdhand smoke and reviewed the materials with the parents. Further, the evidence reflected that the respondent and the mother were made aware of the medical issues that exposure to smoke particles during their visits could cause Corey. Specifically, Keniston advised the respondent and the mother that Corey's pediatrician had reported to the foster parents that thirdhand smoke from the biological parents' visits was impacting Corey's health. The court found that, despite these attempts to change the parents' smoking habits, the parents "demonstrated little concern and understanding of [Corey's] medical needs in regard to the impact [thirdhand] smoke has on [Corey] . . . and instead shifted blame to [the department]."

Further, the parents represented, in several instances, that they were attempting to quit smoking, or that they had quit smoking, further undermining the respondent's claim that the department should have recognized a need for its further intervention. For example, after Keniston advised the parents of the effects of smoking on Corey's health, the respondent and the mother stated that they were going to quit smoking.

Specifically, the respondent stated that he scheduled an appointment with his primary care doctor to discuss quitting options. However, despite these assertions, the mother represented to Sound Community Services on April 8, 2019, that she was a heavy tobacco smoker from January 3, 2017, to the *present*. Further, there was evidence that, when Hooper visited the respondent's and the mother's residence in January, 2019, she noticed cigarette butts outside the home and smelled stale smoke in the home. As this court previously has held, reasonable efforts by the department include doing everything "reasonable," not everything "possible." (Internal quotation marks omitted.) *In re G.S.*, supra, 117 Conn. App. 716. Here, the evidence reflects that the parents were provided with educational tools to stop smoking, and, more importantly, they were advised how their smoking adversely affected Corey's health.

To the extent that the respondent claims that the department failed to provide him or the mother with any specialized smoking cessation services such as cognitive behavioral therapy, nicotine replacement therapy, motivational interviewing or antidepressants, he never made this claim at trial. Further, there was no evidence before the court that the respondent, who signed and agreed with the specific steps, asked the department at any time for any of the smoking cessation services, which, he contends for the first time, on appeal, should have been provided to him. If the respondent believed that the department was not doing enough, he could have moved the court for an order directing the department to provide him with smoking cessation services. The respondent's failure to request such services undermines his present argument that those services were part of what the department should have provided as part of its reasonable efforts to reunify him with Corey.[19] "It is well settled that [o]ur case law and rules of practice generally limit [an appellate] court's review to issues that are distinctly raised at trial." (Internal quotation marks omitted.) *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 142, 84 A.3d 840 (2014). This principle was applied in the context of a reasonable efforts claim in *In re Elijah C.*, 326 Conn. 480, 503–504, 165 A.3d 1149 (2017). In that case, the respondent mother claimed for the first time, on appeal, that the department should have secured an out-of-state assisted living facility for her because none was available in this state. Id. In rejecting this claim, our Supreme Court explained that "the proper place for the respondent to have raised her claim concerning an out-of-state placement was in the trial court, where the issue could have been litigated and a factual record developed as to whether reasonable reunification efforts required the department to search for an out-of-state placement." Id.

"[O]ur courts are instructed to look to the totality of the facts and circumstances presented in each individ-

ual case" in deciding whether reasonable efforts have been made. *In re Unique R.*, 170 Conn. App. 833, 856, 156 A.3d 1 (2017). In this case, the department tailored its reunification efforts to help the respondent overcome the specific impediments to reunification identified by Randall in her updated psychological evaluation in 2018. The department monitored the respondent's engagement with his existing therapist, identified a couples counselor for the respondent and the mother, and referred them to three separate parenting education services, including the TFT program, the most intensive parenting education service available. The department offered to provide the parents with an additional supervised visit every week but they declined. The respondent ignores the totality of the services in which he engaged and narrowly focuses on only two aspects, the lack of feedback from TFT and the lack of an offer of smoking cessation services. We conclude that the court properly considered the totality of the facts and circumstances and correctly determined that the department made reasonable efforts to reunify Corey with the respondent.

B

Next, the respondent argues that the court improperly found that he was unable or unwilling to benefit from the department's reasonable efforts to reunify him with Corey.

As our discussion of the court's decision reflects, in its analysis under § 17a-112 (j) (1), the court found that the department made reasonable reunification efforts. Alternatively, the court found that the respondent was unable or unwilling to benefit from reunification efforts. "[T]he [petitioner] must prove [by clear and convincing evidence] *either* that [the department] has made reasonable efforts to reunify or, *alternatively*, that the parent is unwilling or unable to benefit from the reunification efforts. Section 17a-112 (j) clearly provides that the [petitioner] is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis in original; internal quotation marks omitted.) *In re Anvahnay S.*, 128 Conn. App. 186, 191, 16 A.3d 1244 (2011).

As previously stated, we conclude that the court properly found that the department made reasonable efforts to reunify the respondent with Corey. Because, as we have explained, this finding is sufficient to satisfy § 17a-112 (j), we need not reach the merits of the respondent's argument that the court improperly found that the respondent was unable or unwilling to benefit from those reunification efforts.

II

The respondent next claims that the court improperly concluded that the respondent failed to achieve such a degree of personal rehabilitation as would encourage

the belief that, within a reasonable time, considering Corey's age and needs, the respondent could assume a responsible position in Corey's life. We disagree.

Section 17a-112 (j) (3) (B) requires the court to find by clear and convincing evidence "that . . . the child (i) has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." (Internal quotation marks omitted.) *In re Shane M.*, supra, 318 Conn. 572 n.1.

Our Supreme Court has clarified that "[a] conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Emphasis omitted; internal quotation marks omitted.) Id., 587–88. We will not disturb the court's subordinate factual findings unless they are clearly erroneous. See id., 587.

"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [that the parent has] achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue. . . . As part of the analysis, the trial court must obtain a historical perspective of the respondent's child caring and parenting abilities, which includes prior adjudications of neglect, substance abuse and criminal activity." (Internal quotation marks omitted.) *In re Christopher L.*, 135 Conn. App.

232, 245, 41 A.3d 664 (2012).

Here, the respondent claims that "virtually all of the factual predicates that the trial court relied upon to support its legal conclusion are clearly erroneous," and, therefore, that "there is insufficient evidence to support the trial court's conclusion that the [respondent] failed to rehabilitate . . . ." Specifically, the respondent highlights eight factual findings, each of which we will address in turn. We conclude that the court's subordinate factual findings are supported by the evidence and the rational inferences to be drawn therefrom, and, thus, the respondent has failed to demonstrate that there was insufficient evidence to support the court's determination that he failed to rehabilitate.

First, the respondent challenges as clearly erroneous the court's finding that "the parents demonstrated limited skills, particularly with the use of [Corey's] car seat." The respondent argues that this finding "does not support the trial court's conclusion that [he] failed to rehabilitate because it does not tend to show that [he] will not be able to assume a responsible position in [Corey's] life at some future point." In support of his argument, the respondent cites to studies highlighting the high frequency with which parents misuse child car seats.[20] We disagree with the respondent and conclude that the court's finding was not clearly erroneous.

At trial, Randall testified that she observed the respondent and the mother struggle for about eight minutes trying to put Corey in a car seat. She further testified that the respondent sought the aid of one of the foster mothers to resolve the issue. Randall testified that the parents' difficulty with the car seat raised more general concerns about the parents' "ability just to do basic kinds of childcare needs because that is a very basic need." The evidence thus reflected that a parent's ability to utilize a car seat is a basic parenting skill that, when viewed in light of the parents' other parenting skills, sheds light on whether they possess the ability to adequately care for a child. Therefore, we disagree with the respondent's argument that his difficulty with the car seat does not relate more generally to his ability to responsibly provide for Corey. Accordingly, we conclude that the court's finding was not clearly erroneous because it was adequately supported by evidence presented at trial and the reasonable inferences drawn therefrom.

Second, the respondent challenges as clearly erroneous the court's finding that he was unable or unwilling to change the mother's smoking habits. Specifically, the respondent claims that it is "fundamentally unfair" to hold him responsible for the mother's actions, and he also argues that a parent's failure to stop smoking should not be a reason to terminate their parental rights. We conclude that the court's finding was not clearly erroneous because the evidence presented at trial sup-

ported the fact that the mother smoked cigarettes from the beginning of the case until the beginning of trial in April, 2019. Further, the respondent was aware of the dangers that smoking posed to Corey due to his unique medical conditions, including asthma, reflux disease, and bronchitis. Indeed, through the respondent's own efforts to quit smoking, he demonstrated that he recognized the adverse effects smoking had on Corey's health. Moreover, even though the parents were given specific instructions as to how to avoid exposing Corey to thirdhand smoke during their visits at TFT in early 2018, Corey's adverse reactions after their visits persisted well into 2019. If the respondent, who accompanied the mother to the visits, was aware that he or the mother, or both of them, were not adhering to these instructions in order to avoid further harm to Corey, he exercised poor judgment in failing to disclose that lack of compliance to the person supervising the visits. Therefore, it was reasonable for the court to consider the respondent's efforts to protect Corey from both his and the mother's smoking with respect to whether the respondent failed to rehabilitate. The respondent and the mother were married and living together, and, therefore, the mother's smoking would affect whether the respondent could provide Corey with a safe home environment.

Third, the respondent challenges as clearly erroneous the court's finding that he has a sporadic history with individual counseling. We disagree with the respondent and conclude that evidence was presented at trial that clearly supports the court's finding. Specifically, at trial, Hooper testified that the respondent, despite the fact that engaging in individual counseling was one of his required specific steps, discontinued his therapy from February until October, 2018. This significant gap in treatment is sufficient to support the court's finding that the respondent's history with individual counseling was sporadic. The respondent argues that from July through October, 2018, he did not need to partake in individual counseling because he was engaged in couples counseling with the mother, although the court found that there was no record of the parents' successful completion of counseling. Given the number of months in which the respondent was not engaged in the requisite individual counseling, a time period during which his compliance with specific steps was crucial, the court's finding is not clearly erroneous.

Fourth, the respondent challenges as clearly erroneous the court's finding that he, "by history, has mental health diagnoses," as well as a history of substance abuse. The respondent does not dispute that he has a history of both mental health diagnoses as well as substance abuse issues. He also does not dispute that adequate evidence was presented at trial to support these histories. Rather, the respondent argues that, by referencing these histories, the court suggested that

the respondent still suffered from past mental health diagnoses or substance abuse issues at the time of trial. Simply put, the court made no such suggestion, and we therefore reject the respondent's claim with regard to this finding, as it is not based on the facts found.[21]

Fifth, the respondent challenges as clearly erroneous the court's finding that he did not have a clear plan for Corey if reunification were to occur. In particular, the court stated that the parents' "employment would make a parenting plan difficult" and that "[the respondent] indicated that [the] mother would never be left home unsupervised with [Corey] but did not have a reasonable plan for who would supervise [him] while he was working up to [seventy] hours per week." The respondent argues that the evidence presented at trial did not support the court's finding because Hooper testified that the respondent had "talked about possibly having [Corey] go into day care while [the respondent is working]."

At trial, however, no evidence was presented as to which day care Corey would attend, who would provide the transportation, or who would pay for the childcare. Further, the mother testified that, due to her employment as a live-in companion, she lived at a client's home from Thursdays through Sundays. Although the mother mentioned the possibility of alternate employment or an alternate shift, she did not provide any clear idea of what her employment would consist of were Corey to return home. The parents did not provide a concrete plan that would account for the respondent working seventy hours per week, including Saturdays and Sundays, and the mother being absent four out of seven days of the week. Keniston also expressed concern regarding the parents' incomplete care plan for Corey. Specifically, in a TFT appointment summary, she questioned "how realistic the [parents'] plan was and if it was beneficial for [Corey] . . . to return home to a household where he can't be alone with his mother." Further, Randall stated: "I do not believe . . . that [the respondent] would become the only caregiver and that [the mother] would not have a significant role in that. That goes against really what their relationship is. [The respondent] kind of has a tendency to . . . give in to [the mother] and to give her what she wants, and I believe that if she wanted to take primary care of [Corey], that [the respondent] would be pretty likely to allow that." On the basis of the evidence presented at trial and the reasonable inferences that could be drawn from the evidence, we conclude that the court's finding that the respondent did not have an acceptable parenting plan for Corey was not clearly erroneous.

Sixth, the respondent challenges as clearly erroneous the court's finding that he and the mother had a "history of difficulties" as a couple. We disagree with the respondent because sufficient evidence was presented at trial

to support this finding, and, thus, it is not clearly erroneous. The court found that the respondent and the mother indicated that the multiple days of separation that resulted from their weekly work schedules reduced the likelihood of relationship discord and that the parents' Facebook pages in August, 2018, contained allegations of infidelity and a discussion of potential separation. Several arguments between the parents had been observed by department workers. For example, Randall testified that the mother had a history of infidelity while she and the respondent were together and that the respondent had a history of domestic violence against the mother. Hooper also testified that the biological parents "have struggled with being able to resolve conflicts in a positive way" and that "[the respondent] reported that he had one time become angry and choked [the mother]." Randall also testified that the respondent and the mother "tend to get aggravated with each other" and that "the relationship issues between the two of them were a concern" for her. She went on to state that the respondent is a "very dependent individual," that the respondent and the mother "are very dependent on each other" and that she has "continuing concerns about the strength of their relationship." On the basis of the evidence presented at trial and the reasonable inferences to be drawn from the evidence, we conclude that the court's finding that the respondent and the mother had a history of difficulties was not clearly erroneous.

Seventh, the respondent challenges as clearly erroneous the court's findings that relate solely to the mother because the respondent argues that they "simply do not apply to the issue of whether [he] failed to rehabilitate." We disagree. This court has previously held that, despite the department's failure to put in concrete terms any requirement that the father change his relationship with the mother, the negative relationship between the parents posed a significant barrier to the father's rehabilitation as a parent because he failed fully to appreciate the risk that the mother, who suffered from numerous impairments that interfered with her parenting, could pose to their young child. See *In re Albert M.*, 124 Conn. App. 561, 565, 6 A.3d 815, cert. denied, 299 Conn. 920, 10 A.3d 1050 (2010). Here, similarly, although the respondent's specific steps did not require him to separate from the mother, the respondent was aware that if he and the mother were to remain a unified couple, the mother's parenting deficiencies posed a significant barrier to reunification. During one of the TFT meetings in May, 2018, the respondent was advised that "the department's permanency plan is adoption due to concerns of [the mother's] mental health and the inability shown in visits to meet [Corey's] needs. . . . [The respondent] reported that he wouldn't have married [the mother] if he would have known this would happen. [The department social worker] explained that even

though the majority of the concerns are with [the mother], the department assesses the parents together as one to determine if reunification is appropriate." The respondent's understanding that the mother posed a barrier to reunification was further evidenced when he told the TFT community worker that he was working to create a care plan for Corey "so [that the mother] will not be alone with [Corey]."[22] At trial, when asked by counsel for Corey, "[a]nd if parents are presenting as a unified couple, together, would you agree that one's lack of engagement would reflect negatively on the other?" Randall responded, "[y]es, I would agree with that." Moreover, the respondent was aware that the mother had previously lost custody of her other two children and that she had reported wanting to "shake" one of those children. In fact, he was the mother's boyfriend and provided emotional support throughout the period when her parental rights as to her second child were being terminated. On the basis of the respondent's involvement with the mother and his knowledge of the mother's significant parenting issues, the court's findings with respect to the mother were related to the issue of whether the respondent had rehabilitated, especially because it noted that "the parents present as a committed couple," and "[n]either parent demonstrates a desire or ability to be a single parent."

In determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific steps ordered by the court or imposed by the department. See *In re Shane M.*, supra, 318 Conn. 586. The court in the present case dealt with the respondent's rehabilitation issues by accepting the fact that the parents were a firmly committed unit. It never ordered that the respondent separate from the mother. In its decision, the court did not fault the respondent for not separating from the mother. Rather, it faulted him for not having a reasonable plan as to who would care for Corey, other than the mother, while he was at work seventy hours a week, and for being unable or unwilling to change the mother's smoking habits to make the home environment safer for Corey. It also found that the respondent did not have "sufficient insight into the negative effect [the] mother's mental health has on her parenting, despite [the respondent's] substantial period of individual counseling." By failing to sufficiently develop a plan to protect Corey from the mother's deficient parenting, the respondent demonstrated poor judgment and undermined any prospect of Corey's being reunified with him. Regardless of the moderate progress that the respondent made personally toward complying with some of his specific steps, Corey could not be reunited with the respondent until the overall environment in the parental home would not pose a threat to Corey.

Therefore, the following evidence presented at trial, relating to the mother, was relevant to whether the respondent failed to rehabilitate. Randall testified that, because of the mother's post-traumatic stress disorder, which led to her feelings of wanting to shake her other child, the mother had the potential to be very dangerous to a young child in her care. Randall further testified that the mother "is more vulnerable to emotional problems, which could result [in] domestic violence, could result in her even possibly hurting her child because of her own lack of impulse control."[23] The TFT reports, which were introduced into evidence at trial, include a plethora of evidence supporting the mother's inability to safely parent Corey. For example, the mother needed "prompting and redirecting" with Corey, she let him put unsafe and dirty items in his mouth, she spent time on her phone instead of interacting with Corey, she complained about the weight of the car seat, she did not appropriately interact or bond with Corey, and she demonstrated a lack of understanding that her smoking had adverse effects on Corey's health. Randall also testified that she did not believe that the respondent would become the sole caregiver and that the mother would not also play a significant role. Randall testified: "That goes against really what their relationship is. He kind of has a tendency to . . . give in to her and give her what she wants, and I believe that if she wanted to take primary care of the baby, that he would be pretty likely to allow that." On this record, we conclude that it was not improper for the court to determine that the respondent failed to rehabilitate, in part, due to factual findings relating to the mother.

Eighth, the respondent challenges as clearly erroneous the court's finding that, "[d]espite frequent admonitions, [Corey's] physical reaction to visits [with his parents] indicates ongoing exposure to secondhand[24] smoke." (Footnote added.) Preliminarily, the respondent claims that the petitioner did not introduce any expert medical testimony to support the finding that Corey's breathing difficulty and coughing was caused by exposure to smoke particles during his visits with the parents. Specifically, the respondent refers to language from *Sherman* v. *Bristol Hospital, Inc.*, 79 Conn. App. 78, 828 A.2d 1260 (2003), in which this court stated that "[e]xpert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the [layperson]." (Internal quotation marks omitted.) Id., 88. The court went on to state that "[a]n exception to the general rule with regard to expert medical opinion evidence is when the medical condition is obvious or common in everyday life. . . . Similarly, expert opinion may not be necessary as to causation of an injury or illness if the plaintiff's evidence creates a probability so strong that a lay jury can form a reason-

able belief." (Citations omitted; internal quotation marks omitted.) Id., 89.

Here, the petitioner's evidence included a report from Corey's pulmonologist, Palazzo, dated October 1, 2018, in which she stated that Corey had increased mucous, a cough and difficulty breathing on Monday nights into Tuesdays, following visits with his biological parents, which resulted in the need to administer nasal saline and Albuterol. Palazzo's letter also stated: "I am concerned that exposure to [secondhand] smoke from his biological parents' clothes or breath is what is causing these issues" and that "[i]t would be my recommendation to postpone a visit with his biological parents until he has fully recovered from these symptoms." This evidence supports the court's finding that Corey's breathing difficulties were caused by exposure to thirdhand smoke during visits with the respondent and the mother. Although Palazzo did not testify, her report was admitted into evidence without challenge. Because the court did not admit it for a limited purpose, it can be used for all purposes, including establishing causation.[25]

Even if the letter from Palazzo did not establish causation between Corey's breathing problems and thirdhand exposure to smoke particles from the parents, the exception from *Sherman* v. *Bristol Hospital, Inc.*, supra, 79 Conn. App. 89, would apply because the petitioner's evidence created a probability so strong that a reasonable trier of fact, applying a commonsense evaluation to the evidence, would be able to form a reasonable belief with respect to causation. In addition to the letter from Corey's pulmonologist, Palazzo, the evidence also included reports from TFT indicating that, as early as May, 2018, the foster parents were having to administer asthma treatment to Corey after his visits and that his pediatrician had advised the foster parents that thirdhand smoke could be the issue. In her testimony, Hooper, the department social worker, stated that she visited with Corey both immediately after his visits with his biological parents and later in the week following those visits. Through these encounters with Corey, Hooper was able to determine that, after his visits with the respondent and the mother, Corey's eyes were "runny" and "red" and he was "miserable."

The respondent fails to recognize the much broader concern that the court was expressing with respect to the parents' smoking, which the court considered "[t]he major example of the parenting deficits . . . ." The court went beyond just finding fault with the parents for aggravating Corey's asthma due to the presence of thirdhand smoke on their persons during supervised visits. Ultimately, even if the thirdhand smoke was possibly not the cause of Corey's adverse reactions after the visits, the continued smoking of one or both of the parents would create an unacceptably risky home environment for a child with the medical issues Corey

has, and, in the court's view, the parents' continued smoking, or the respondent's tolerance of the mother's smoking, indicated an inability to prioritize Corey's medically fragile needs over one's own.

On the basis of the evidence presented by the petitioner and the reasonable inferences to be drawn therefrom, we conclude that the court's finding that Corey's physical reaction to his visits with his parents indicates exposure to thirdhand smoke was not clearly erroneous. Accordingly, we conclude that the court's subordinate findings that were challenged by the respondent are not clearly erroneous, and, therefore, that the court properly determined that the respondent failed to rehabilitate.

### III

Finally, the respondent claims that the court, in its findings in the adjudicatory phase of the proceeding, improperly compared his suitability as a parent, and that of Corey's biological mother, to that of Corey's foster parent during the adjudicatory phase of the termination proceeding. We disagree.

The respondent takes issue with the following language: "[The respondent] expressed a concern that all this work would be a waste of time if they didn't get [Corey] back. [Keniston] noted a lack of affect by [Corey] in the parents' company, especially with [the] mother. *She contrasted this with the warmth and attachment observed between* [*Corey*] *and* [*the*] *foster parent.* At times, [Keniston] had difficulty redirecting [the] mother's attention from [the] mother's cell phone to [Corey]." (Emphasis added.) Although the majority of the court's comparison involved the mother, and not the respondent, the respondent properly challenges the comparison because it references "the parents" and because the parents were being reviewed as a unit, and, therefore, the mother's attachment with Corey also affected the respondent.

We first set forth the applicable standard of review. "The interpretation of a trial court's judgment presents a question of law over which our review is plenary. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment." (Internal quotation marks omitted.) *In re James O.*, 322 Conn. 636, 649, 142 A.3d 1147 (2016).

"[A] judicial termination of parental rights may not be premised on a determination that it would be in the child's best interests to terminate the parent's rights in order to substitute another, more suitable set of adoptive parents.[26] Our statutes and [case law] make it crystal clear that the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear

and convincing evidence. . . . [A] parent cannot be displaced because someone else could do a better job raising the child. . . . The court, however, is statutorily required to determine whether the parent has achieved such degree of personal rehabilitation as would encourage the belief that within a reasonable time, *considering the age and needs of the child*, such parent could assume a responsible position in the life of the child . . . ." (Citation omitted; emphasis in original; footnote added; internal quotation marks omitted.) *In re Zion R.*, 116 Conn. App. 723, 738, 977 A.2d 247 (2009).

In support of their respective positions, both parties cite to our Supreme Court's decision in *In re James O.*, supra, 322 Conn. 636. The petitioner relies on the majority's opinion, and the respondent relies on the concurring opinion in *In re James O.*, as well as attempts to distinguish the majority's analysis from the present case. In *In re James O.*, in concluding that the respondent mother had failed to rehabilitate, the court held that the trial court did not improperly compare the respondent parents with the foster parent of the children at issue. Id., 652–57. The trial court noted that the foster parent provided the children with "an environment that is calm and understanding of the children's needs." (Internal quotation marks omitted.) Id., 653. Further, the court stated that, "[a]s both [children's] therapists have made clear, the children have needed a caregiver who is calm, patient, able to set appropriate limits, willing to participate intensively in the children's therapy, and able to help the children with coping skills to manage their anxiety." (Internal quotation marks omitted.) Id. The court went on to state that the foster mother provided the children with such an environment and that she embodied the requisite characteristics of a parent who could meet the child's needs. "In contrast," the court continued, "[the respondent mother] is volatile and prone to violence, unable to set appropriate limits, unwilling to talk with the children's therapists and, therefore, unable to help them use coping skills to manage their anxiety and ultimately, unwilling to believe the children's statements regarding the trauma." (Internal quotation marks omitted.) Id., 653–54. In reviewing this language, the Supreme Court determined that the trial court's comparison to the foster mother was not improper because it was made "in light of what the children's therapists have testified are the specific needs of the children. . . . The court is basing the level of care needed not on what [the foster mother] is providing to the children, but on what the children's therapists have testified the children need from a caregiver." (Emphasis omitted; internal quotation marks omitted.) Id., 655. Further, "[i]mportantly, the court never opined that [the foster mother] could meet the children's needs or that [the foster mother] ought to be the person to meet their needs." (Internal quotation marks omitted.) Id. There-

fore, our Supreme Court held that the trial court did not improperly compare the respondent mother with the foster mother. Id., 657.

Here, we conclude that the trial court's comparison between the foster parent and the respondent and the mother was not improper. Similar to the challenged decision of the trial court in *In re James O.*, the trial court in the present case used the comparison between the foster parent and the biological parents to highlight Corey's emotional and development needs as outlined by Keniston.[27] In her reports, Keniston repeatedly highlighted that several of the TFT program's goals were to "create a physical and emotional environment" for Corey, and to "establish developmentally appropriate routines that improve attachment . . . ." Therefore, the reference to the lack of affect Corey showed with the mother, compared to the warmth and attachment he showed with the foster parent, was used not to opine that the foster parent ought to be the person to meet Corey's needs but, rather, was made on the basis of what the TFT professionals determined were Corey's specific needs. Further, the court's comparison should not be viewed in isolation because the court's analysis, as a whole, focused on Corey's needs and the biological parents' inability to meet those needs. For example, the court also referenced that, on the basis of Randall's report, "[h]ands-on parenting was also necessary, with a focus for [the] mother on attachment" but that Randall "did not feel [that] either parent was invested in the extra work it takes to create an attachment." Accordingly, we conclude that the court's comparison between the foster parent and the biological parents was not improper.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** June 8, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts . . . to reunify the child with the parent in accordance with subsection (a) of section 17a-111b . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[2] The court's judgment with respect to the termination of the mother's parental rights is not before us on appeal. We therefore refer in this opinion to the father as the respondent. Pursuant to Practice Book § 67-13, the attorney for Corey has adopted the brief filed by the petitioner and has requested that this court affirm the judgment of the trial court as consistent

with his client's best interest.

[3] The record reflects that, eventually, the relatives were no longer able to provide a home for Corey that satisfied applicable licensing requirements, and, therefore, he subsequently was placed in his current foster home in March, 2018.

[4] The record does not reflect why the initial agreement that the parents and Corey reside with the relatives was not implemented.

[5] Specifically, Randall testified that the respondent and the mother "really need to work extra hard at building that kind of attachment relationship with [Corey], and the failure to even make eye contact for most of the session really suggests that that relationship is not there for them and that they're not doing a lot to foster that."

[6] Randall testified that the respondent and the mother "are not able to provide the kind of care that Corey would need in his home, that he would continue to be at risk due to the possibility of emotional volatility within the home, conflicts within the home between the parents."

[7] The respondent's specific steps, in relevant part, were: "Keep all appointments set by or with [the department]. Cooperate with [the department's] home visits, announced or unannounced, and visits by the [child's] court-appointed attorney and/or guardian ad litem. Let [the department], your attorney and the attorney for the [child] know where you and the child(ren) are at all times. Take part in counseling and make progress toward the identified treatment goals: [p]arenting . . . [i]ndividual . . . . Accept in-home support services referred by [the department] and cooperate with them . . . . Submit to random drug testing; the time and method of the testing will be up to [the department] to decide. [Do] [n]ot use illegal drugs or abuse alcohol or medicine. Cooperate with service providers recommended for parenting/individual/family counseling, in-home support services and/or substance abuse assessment/treatment . . . . Cooperate with [court-ordered] evaluations or testing. Sign releases allowing [the department] to communicate with service providers to check on your attendance, cooperation and progress toward identified goals, and for use in future proceedings with this court. Sign the release[s] within [thirty] days. Sign releases allowing your child's attorney and guardian ad litem to review your child's medical, psychological, psychiatric and/or educational records. Get and/or maintain adequate housing and a legal income. Immediately let [the department] know about any changes in the [makeup] of the household to make sure that the change does not hurt the health and safety of the [child] . . . . [Do] [n]ot get involved with the criminal justice system. Cooperate with the Office of Adult Probation or parole officer and follow your conditions of probation or parole. . . . Take care of the [child's] physical, educational, medical, or emotional needs, including keeping the [child's] appointments with his/her/their medical, psychological, psychiatric, or educational providers. . . . Keep the [child] in the [s]tate of Connecticut while this case is going on unless you get permission from [the department] or the court to take them out of state. You must get permission first. Visit the [child] as often as [the department] permits. Within thirty (30) days of this order, and at any time after that, tell [the department] in writing the name, address, family relationship, and birth date of any person(s) who you would like the department to investigate and consider as a placement resource for the [child]. Tell [the department] the names and addresses of the grandparents of the [child]."

The respondent signed these steps and agreed to comply with them.

[8] There was evidence before the court that the respondent works from approximately 7:30 a.m. until 6 or 7 p.m., Monday through Friday; 8 a.m. to 5 p.m. on Saturdays; and 9 a.m. until 4 p.m. on Sundays.

[9] "The goal of TFT is to provide an intervention between the child and his parents so that the child can benefit as much as possible from the contact. TFT provides direct consultation and assessment, works directly with parents on parenting skills, and works towards improving parent/child interactions and promotes attachments."

[10] There was evidence before the court that, at one of the TFT visits, the respondent stated to Keniston, "I love [Corey], but I regret having him."

[11] There was evidence before the court that the mother's post-traumatic stress disorder had contributed to her prior feelings of wanting to shake one of her other children when she was unable to comfort him.

[12] The evidence reflects that the date of case closure was June 18, 2018, and that closure was recommended by Keniston.

[13] Although, in its memorandum of decision, the court referred to the exposure to smoke particles through fabrics as secondhand smoke, this

type of exposure is known as thirdhand smoke. "Thirdhand smoke is residual nicotine and other chemicals left on indoor surfaces by tobacco smoke. People are exposed to these chemicals by touching contaminated surfaces or breathing in the off-gassing from these surfaces." J. Taylor Hays, M.D., Mayo Clinic, "What is thirdhand smoke, and why is it a concern?" (July 13, 2017), available at https://www.mayoclinic.org/healthy-lifestyle/adult-health/expert-answers/third-hand-smoke/faq-20057791 (last visited June 8, 2020).

[14] There is evidence that on May 11, 2018, at an administrative case review meeting at TFT at which the respondent, but not the mother, was present, Cassandra Bunkley, the administrative case review facilitator, explained to the respondent that the foster parents had reported that they had to administer breathing treatment to Corey after he returned from visits with the parents. The respondent indicated that the parents did not smoke during visits, but Bunkley explained that the lingering smell of smoke in clothes and hair can trigger an infant's asthma. It was then decided that the parents would not smoke three hours prior to their visits and would change their clothes. Keniston again discussed the effects of thirdhand smoke during appointments on June 4, June 11 and June 18, 2018. In Hooper's addendum to the department's social study in support of its petition for termination of parental rights, dated April 9, 2019, she also noted that, although both parents maintained that they had quit smoking, Corey continued to have asthma attacks after visits.

[15] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[16] The preliminary specific steps set on October 4, 2017, the date of the issuance of the ex parte order of temporary custody, were required pursuant to General Statutes § 46b-129 (c) (6) and Practice Book § 33a-7 (a) (8). The final specific steps were issued on March 6, 2018, at the time of the neglect adjudication and commitment.

[17] Specifically, the respondent argues for the first time, on appeal, that the department should have provided him with behavioral treatment, such as cognitive behavioral therapy or motivational interviewing, and medication, such as nicotine replacement therapy, Bupropion, Varenicline, or antidepressants.

[18] As part of his argument, the respondent cites to numerous resources emphasizing the addictive nature of nicotine. The record reflects that these resources were not admitted into evidence before the trial court, they are not part of the record and, thus, on appeal, we do not consider them. "[W]e cannot consider evidence not available to the trial court to find adjudicative facts for the first time on appeal. . . . It is well established that this court does not find facts." (Internal quotation marks omitted.) *D'Amato* v. *Hart-D'Amato*, 169 Conn. App. 669, 685, 152 A.3d 546 (2016). Even if we were to consider the resources cited by the respondent, his argument still fails to address the department's repeated attempts to address his and the moth-

er's smoking.

[19] No such requirement of the department for smoking cessation services was set forth in the specific steps, and the respondent signed both forms, indicating he understood that he "should contact my lawyer and/or [the department] worker if I need help in reaching any of these steps."

[20] The record reflects that the studies cited by the respondent were not admitted as exhibits before the trial court, they were not part of the record, and, therefore, we cannot consider them on appeal. "[W]e cannot consider evidence not available to the trial court to find adjudicative facts for the first time on appeal. . . . It is well established that this court does not find facts." (Internal quotation marks omitted.) *D'Amato* v. *Hart-D'Amato*, 169 Conn. App. 669, 685, 152 A.3d 546 (2016).

[21] In her updated evaluation, which was in evidence, Randall diagnosed the respondent with major depressive disorder, in remission.

[22] There was evidence that, in response to the respondent's statement that he was working to create a care plan for Corey, Keniston questioned how realistic it would be for Corey to live in a household where he cannot be alone with the mother and whether that arrangement would be beneficial for Corey. The respondent also told Keniston that he did not have any concern if the mother was left alone with Corey.

[23] As part of the mother's psychiatric treatment with Sound Community Services, she reported, "I go from calm, cool to I want to kill you status. I get triggered when my husband asks me [twenty] questions or someone mentions my kids." She also reported that her "mood is highly and quickly changeable . . . varying from calm to enraged over a matter of hours."

[24] See footnote 14 of this opinion.

[25] To the extent that the respondent claims that the report from Palazzo constituted "wholly unreliable hearsay evidence," he failed to object to its admission on that, or any other ground, at trial.

[26] We should note, however, that in the dispositional phase, pursuant to § 17a-112 (k) (4), one of the seven findings on which the court must opine is "the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties . . . ." At the time of trial, Corey had been living with his foster parents for more than one year.

[27] This evidence also established that Corey is not a child incapable of forming an attachment to a caregiver.

———————————————